UNITED STATES, Appellee

v.

Michael M.A. BYGRAVE Boatswain's
Mate Second Class, U.S. Navy,
Appellant.

No. 96–0702.
Crim.App. No. 92–1737.

U.S. Court of Appeals for
the Armed Forces.

Argued April 1, 1997.

Decided Aug. 28, 1997.

For Appellant: *Lieutenant C.J. McEntee,*
JAGC, USNR (argued).

For Appellee: *Lieutenant Bennett J. Lee,*
JAGC, USNR (argued); *Colonel C. Wm.*
*Dorman,* USMC, and *Commander D.H.*

*Myers*, JAGC, USN (on brief); *Lieutenant Andrew J. Waghorn*, JAGC, USNR.

## Opinion of the Court

ARTERTON, District Judge:[1]

Appellant was tried by a general court-martial, military judge alone, on March 23 and 25, 1992, and was convicted of two specifications of assault with a means likely to cause death or grievous bodily harm, in violation of Article 128(b)(1), Uniform Code of Military Justice, 10 USC § 928(b)(1). Appellant was sentenced to a bad-conduct discharge, confinement for 4 years, total forfeitures, and reduction to pay grade E–1. On June 26, 1992, the convening authority approved the sentence and, with the exception of the bad-conduct discharge, ordered it executed. The Navy–Marine Corps Court of Military Review (now the Court of Criminal Appeals [2]) initially ordered a new convening authority's action, 40 MJ 839 (1994), subsequent to which the Court of Criminal Appeals affirmed the findings and the approved sentence in an unpublished opinion dated January 31, 1996. We granted review of the following issue:

> WHETHER THE FINDING OF GUILTY TO AGGRAVATED ASSAULT CAN STAND IN LIGHT OF THE FACT THAT THE ALLEGED VICTIM CONSENTED TO HAVING SEXUAL INTERCOURSE WITH APPELLANT DESPITE ACTUAL KNOWLEDGE THAT APPELLANT WAS HIV–POSITIVE.

### FACTS

In 1986, appellant tested positive for the Human Immunodeficiency Virus (HIV), resulting in treatment at the HIV Ward of the Naval Hospital in San Diego. Despite warnings of the risk of spreading the virus through sexual intercourse, appellant maintained a sexually active lifestyle involving at least two partners. The first partner, Petty Officer J, engaged in heterosexual sex with appellant over a year-long period, including acts of unprotected sex. Appellant did not warn Petty Officer J that he was HIV-positive. In June 1988, Petty Officer J herself tested positive for the virus.

Appellant's second partner, beginning in January 1990, was Boatswain's Mate Third Class (BM3) C. Prior to commencing sexual relations, appellant informed BM3 C of his HIV-positive status. Thereafter, appellant and BM3 C engaged in consensual sexual intercourse on a regular basis, using a condom on most, but not all, occasions. In July 1991, BM3 C tested positive for HIV. Six months later, BM3 C and appellant were married.

After a trial in March of 1992, a general court-martial convicted appellant on two specifications of aggravated assault, one arising from his sexual relationship with Petty Officer J; the other from his sexual relationship with BM3 C. Appellant has not challenged his conviction on the first specification. The only issue before us on the present appeal is whether BM3 C's informed consent constitutes a valid defense to the second specification.

### DISCUSSION

This Court has made clear on numerous occasions that an HIV-positive service member commits an aggravated assault by having unprotected sexual intercourse with an uninformed partner.[3] *United States v. Schoolfield*, 40 MJ 132 (CMA 1994); *United States*

---

1. Judge Janet Bond Arterton of the United States District Court for the District of Connecticut, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f). We heard oral argument in this case at the United States Coast Guard Academy, New London, Connecticut, without objection from the parties involved. *See* 34 MJ 228, 229 n. 1 (1992).

2. *See* 41 MJ 213, 229 n. * (1994).

3. The elements of aggravated assault are as follows:

(i) That the accused attempted to do, offered to do, or did bodily harm to a certain person;
(ii) That the accused did so with a certain weapon, means, or force;
(iii) That the attempt, offer, or bodily harm was done with unlawful force or violence; and
(iv) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

Para. 54b (4)(a), Part IV, Manual for Courts-Martial, United States (1995 ed.).

*v. Joseph*, 37 MJ 392 (CMA 1993); *United States v. Johnson*, 30 MJ 53 (CMA 1990). We have concluded that "under many circumstances, AIDS [Acquired Immune Deficiency Syndrome] is 'the natural and probable consequence' of exposure to HIV." *Id.* at 57 (citation and emphasis omitted). Accordingly, we have held that any time a service member "willfully or deliberately" exposes another person to HIV, that service member may be found to have acted in a manner "likely to produce death or grievous bodily harm." *Joseph*, 37 MJ at 396.

While appellant obviously can make no claim that informed consent by itself eliminates the risk of HIV transmission—indeed, the infection of appellant's wife would persuasively belie any argument to that effect—he offers a number of other reasons why he believes that informed consent either removes this case from the ambit of Article 128 or renders his prosecution under Article 128 unconstitutional.

### I. Statutory Issues

Appellant correctly notes that none of our prior HIV decisions squarely address whether informed consent provides a defense to a prosecution for aggravated assault under Article 128. However, the relevance of the victim's state of mind is not readily apparent on the face of the statute. We note that aggravated assault is not a crime like rape, in which lack of consent is an element of the offense. *See* Art. 120(a), UCMJ, 10 USC § 920(a). Moreover, the very nature of the offense invalidates, as a matter of law, any consent that has been given. Aggravated assault, of course, differs from simple assault in that the perpetrator has used a "means or force likely to produce death or grievous

bodily harm." Art. 128(b)(1). As this Court has previously observed, "[O]ne cannot consent to an act which is likely to produce grievous bodily harm or death." *United States v. Outhier*, 45 MJ 326, 330 (1996). Thus, while under certain circumstances consent may be a defense to simple assault, *Joseph*, 37 MJ at 396 n. 5, consent is generally not a valid defense to aggravated assault.[4] *See, e.g., United States v. Outhier, supra; United States v. Brantner*, 28 MJ 941, 944 (NMCMR 1989); R. Perkins & R. Boyce, *Criminal Law* 155 (3d ed.1982).

At oral argument, appellant suggested that consent negates one of the required elements of aggravated assault, namely, that the act be perpetrated with "unlawful force or violence." However, our prior decisions make clear that an act of sexual intercourse may in some circumstances be an "offensive touching" subject to prosecution under Article 128, even in the absence of overt coercion or violence. *See, e.g., Joseph*, 37 MJ at 395 n. 4. In order for consent to be relevant to the "unlawful force or violence" element, the consent must be legally cognizable. For that reason, consent to sex secured without disclosure of HIV-positive status does not remove the act from the ambit of Article 128, for the consent has been improperly obtained. *See id.* at 395–96. By similar reasoning, even informed consent cannot save an accused in a case such as this one, for, as we have just noted, assault law does not recognize the validity of consent to an act that is likely to result in grievous injury or death, such as unprotected sex with an HIV-positive partner.[5] Given that appellant's unprotected sex acts with BM3 C were performed without legally valid consent, we must conclude that they amount to "unlawful force or violence"

---

4. In this respect, aggravated assault is like numerous other crimes under the Uniform Code of Military Justice in which the consent of the immediate "victim" is irrelevant because of the broad military and societal interests in deterring the criminalized conduct. *See, e.g.*, Arts. 114 (dueling), 120 (carnal knowledge), and 134 (bigamy), UCMJ, 10 USC §§ 914, 920, and 934, respectively.

5. Because appellant was only prosecuted for having unprotected sex, we need not, and do not,

address whether one may validly consent to protected sex with an HIV-positive partner. Although we have previously held that, in certain circumstances, a court may find that protected sex is an act likely to result in grievous bodily harm or death, *see United States v. Joseph*, 37 MJ 392, 397 (CMA 1993), we have never held that protected sex with an HIV-positive partner must be so found as a matter of law.

within the meaning of Article 128.[6]

Next, appellant points to the numerous states that have adopted specific criminal statutes addressing HIV transmission, including some that provide for a defense of informed consent. Appellant contends that the criminalization of HIV transmission, particularly in the context of informed consent, requires us to balance a number of highly sensitive public-policy concerns. Appellant argues that Congress should follow the lead of many state legislatures in passing a law to address this issue directly, and that this Court should refrain from holding that Article 128 encompasses informed, consensual sex until after Congress decides how to balance the competing interests. The problem with appellant's argument is that Congress has already established a mechanism for balancing the competing interests: Article 128. The Uniform Code of Military Justice provides for the prosecution of individuals who commit assault by "means or force likely to produce death or grievous bodily harm." Congress created no exceptions for cases in which the act likely to produce grievous bodily harm is sexual intercourse involving a person who is HIV-positive. Congress is certainly entitled to carve out exceptions for this class of cases, or subcategories thereof, and appellant has offered valid public-policy reasons in support of such legislation; how-

ever, until Congress acts to remove HIV transmission from the ambit of Article 128, the precedents of this Court clearly establish that conduct like appellant's, with or without the sex partner's informed consent, falls within the statutory meaning of "aggravated assault" under the UCMJ.

## II. Constitutional Issues

█ Having concluded that appellant could be found to have committed aggravated assault in violation of Article 128, the Court may now address the question of whether appellant's conviction violated his constitutional rights. Appellant argues that he had a fundamental right under the United States Constitution to engage in sexual intercourse, and that this right cannot be significantly burdened absent a showing of a compelling governmental interest. The Government readily concedes that its interpretation of Article 128 substantially burdens the sexual activity of military personnel who are HIV-positive.[7] However, the Government contends that appellant has no constitutional right to sex, and that appellant's prosecution is therefore not subject to strict scrutiny. The Government further argues that its interests are sufficiently weighty to survive strict scrutiny, if such heightened constitutional review is found to be applicable.[8]

6. Because there is no dispute that BM3 C was HIV-free prior to her relationship with appellant, we need not address the question of whether, or under what circumstances, one who is already HIV-positive may provide valid consent to sexual intercourse with another HIV-positive individual. If the added health risk of sexual intercourse between people who are already HIV-positive was shown to be minimal, then we might be more inclined to view informed consent as relevant to the Article 128 analysis. However, appellant has not argued that these circumstances are present in his case; nor have we been provided with an evidentiary record as to current medical knowledge of any increased health risks under these circumstances. See Gruca v. Alpha Therapeutic Corp., 51 F.3d 638, 641–43 (7th Cir.1995) (noting expert testimony offered at trial as to "antigenic stimulation" theory, under which additional exposure to HIV increases speed with which HIV-positive individuals begin to show symptoms of full-blown AIDS, and remanding case to trial court to determine whether testimony on this theory comported with requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

In a similar vein, we note that appellant does not challenge the medical conclusions underlying our prior holdings that exposure to HIV is likely to produce grievous bodily harm or death. However, continued progress in the treatment of HIV patients may some day necessitate a reconsideration of those conclusions.

7. Indeed, the Government's position seems to be that complete abstinence is required of such personnel. However, our decision in the present case need not, and does not, address whether Article 128 encompasses all sexual activity by HIV-positive servicemembers. See, e.g., nn. 5–6, supra.

8. We note a certain irony in the Government's present assertion of a compelling interest in celibacy by HIV-positive servicemembers: although the military provides extensive training and instruction to servicemembers when they contract the virus, the military has not in that context expressly mandated that HIV-positive service-

There can be no doubt that certain aspects of reproductive behavior are safeguarded by a constitutional right to privacy, which has been variously located in the Due Process Clause, the Ninth Amendment, and the "penumbra" of the rights set forth in the Bill of Rights. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding that women have right to terminate pregnancies); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (holding that married persons have right to use contraceptives). At the same time, the Supreme Court has made equally clear that there is no generalized constitutional right to sexual intimacy between consenting adults. *See, e.g., Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (holding that homosexuals do not have a constitutional right to engage in sodomy). However, between the poles of *Griswold* and *Bowers,* the constitutional terrain, at least insofar as it has been laid out by the Supreme Court, grows more difficult to negotiate.

This Court's prior decisions provide additional guideposts, but do not conclusively establish whether appellant's conduct falls within a constitutionally protected zone of privacy. We have previously held, for instance, that no constitutional right to privacy safeguards heterosexual oral sex between consenting adults. *United States v. Henderson,* 34 MJ 174 (CMA 1992). However, the present case may be distinguishable insofar as appellant's conviction was based on heterosexual vaginal intercourse. On the other hand, the fact that appellant was unmarried at the time of these sex acts may also be of constitutional significance. *See United States v. Scoby,* 5 MJ 160, 166 (CMA

1978) (holding that Constitution does not protect acts of oral sex between unmarried adults, but declining to address whether an exception would exist for a married couple); *cf. Bowers,* 478 U.S. at 190–91, 106 S.Ct. at 2843–44 (observing that Supreme Court's privacy decisions have been limited to contexts of "family, marriage, [and] procreation"). *But cf. Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) ("If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."). In sum, framing the question as to whether the constitutional right of privacy encompasses private acts of heterosexual intercourse between unmarried adults, our prior decisions provide no conclusive answer.

■ In such circumstances, when we are asked to recognize a fundamental constitutional right where neither the Supreme Court nor our own precedents have expressly done so in the past, we believe the most prudent course of action is to assess the governmental interests counter-balancing the proposed right before determining conclusively whether the right exists. *See Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 279–82, 110 S.Ct. 2841, 2852–53, 111 L.Ed.2d 224 (1990) (assuming, but not deciding, that the Constitution provides right "to refuse lifesaving hydration and nutrition," but upholding state regulations infringing this right by reference to weight of state's interests). It is, of course, well-established that the mere existence of a constitutionally protected zone of privacy does not "automati-

members refrain from all sexual intercourse. Indeed, HIV-positive servicemembers are ordered to avoid unprotected sex and to notify prospective sex partners that they carry the virus, implicitly suggesting that safe sex with a properly forewarned partner is permissible. Thus, the prosecution of an HIV-positive servicemember for having safe sex after providing appropriate notice of his status to his or her partner might conceivably raise constitutional due process concerns. *See United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) ("The underlying principle is that no man shall be held criminally responsible for conduct which

he could not reasonably understand to be proscribed."). In the present case, however, appellant does not dispute that he violated his safe-sex instruction on at least one or two occasions with BM3 C; nor has appellant raised a fair-notice argument in this appeal.

Thus, while we note with concern the apparent inconsistency in the Government's policies with respect to HIV-positive servicemembers, we do not address whether, or under what circumstances, such inconsistency may be relevant to a prosecution for *protected* sex when there has been informed consent.

cally invalidate every state regulation in this area." *Carey v. Population Services International,* 431 U.S. 678, 685–86, 97 S.Ct. 2010, 2016–17, 52 L.Ed.2d 675 (1977). "[E]ven a burdensome regulation may be validated by a sufficiently compelling state interest." *Id.* at 686, 97 S.Ct. at 2016.

Thus, if compelling interests may be identified, a governmental action, assuming such action to be narrowly tailored to advance the relevant interests, may be sustained regardless of whether protected privacy rights are infringed. *See Roe,* 410 U.S. at 162–64, 93 S.Ct. at 731–32 (holding that mother's privacy interest in deciding whether or not to terminate her pregnancy could be counterbalanced in the second trimester by the state's compelling interests in her health and in the third trimester by the state's compelling interests in "protecting the potentiality of human life"). Establishing the existence of compelling governmental interests may thereby permit a court to avoid the parlous task of articulating a previously unrecognized fundamental right. *See Bowers,* 478 U.S. at 194, 106 S.Ct. at 2846 ("The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution."); Sunstein, *The Right to Die,* 106 Yale L.J. 1123, 1161–62 (1997) (arguing that courts confronting right-to-die issue should proceed differently than the Supreme Court did in *Roe,* specifically by avoiding creation of a "broad" right in the first confrontation with the issue and by engaging "in a form of dialogue with the political process" with respect to interests involved).

Reviewing the Government's interests in the present case, we have little difficulty concluding that the Government has a legitimate interest in the health and life of appellant's wife. *See Cruzan,* 497 U.S. at 282, 110 S.Ct. at 2853 ("[A] state may ... simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interests of the individual."); *Roe,* 410 U.S. at 162, 93 S.Ct. at 731 ("[T]he State [has] an important and legitimate interest in preserving and protecting the health of the pregnant woman,"

which is "separate and distinct" from its "interest in protecting the potentiality of human life."). This interest is not negated by the fact that appellant's wife chose to put her own health in danger by having unprotected sex with an HIV-positive partner. *Id.* at 163, 93 S.Ct. at 732 (holding that state's interest in health of woman choosing to have abortion rises to level of "compelling" after first trimester in light of riskiness of second-trimester abortions). Indeed, the Government's interests are heightened by the nature of the risk assumed by BM3 C: infection by a contagious deadly disease. By compromising her own health, she also risked compromising the health of others. The Government's interests in the present case are not limited to the health of BM3 C, but also encompass the health of any sexual partners she may have in the future, any children she may bear, and anyone else to whom she may potentially transmit HIV through nonsexual contact.

Most crucially in the present case, however, is the fact that BM3 C was a member of the United States armed forces at the time of the sex acts in question. Where the life of one service member is put into serious jeopardy by the act of another service member, we must generally conclude that the Government has a compelling interest in proscribing the act and prosecuting the actor. As we have previously observed in reference to the military's efforts to stem the spread of AIDS, "The military, and society at large, have a compelling interest in having those who defend the nation remain healthy and capable of performing their duty." *United States v. Womack,* 29 MJ 88, 90 (CMA 1989). When a member of the armed forces becomes infected with HIV, the military's duty-readiness is not merely reduced, but the Government must also bear the potentially extraordinary expenses of medical care associated with an AIDS patient. And, of course, as noted above, a newly-infected service member may then spread the disease to other noninfected service members. For similar reasons, military courts have often upheld the lawfulness of orders designed to contain the spread of communicable diseases, even where those orders trench on important individual rights.

*See, e.g., United States v. Pritchard,* 45 MJ 126, 131 (1996) (finding no plain error in military judge's reasoning that safe-sex order might be "a lawful order because of potential adverse-extremely adverse effects upon the spouse [of the infected servicemember], perhaps even the military, tangentially through medical care that might be provided"); *United States v. Wheeler,* 12 USCMA 387, 30 CMR 387 (1961) (upholding Navy regulation requiring a medical certificate showing the absence of certain communicable diseases as a prerequisite to approval for a servicemember to marry a foreign national); *United States v. Chadwell,* 36 CMR 741 (NBR 1965) (upholding an order requiring inoculations against certain communicable diseases notwithstanding accused's conflicting religious beliefs).

Under the factual circumstances presented by this case, we need not, and do not, address the weight of the Government's interests in preventing the spread of HIV from a servicemember to a civilian. Nor need we consider whether our evaluation of the interests in the present case would differ if appellant had been prosecuted for sexual acts within the context of a marital relationship. We do conclude, however, that the Government has sufficiently compelling interests to proscribe unprotected sexual intercourse between HIV-positive servicemembers and uninfected, unmarried, noncivilian partners, even assuming that some sort of constitutional right to private heterosexual intercourse exists.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, GIERKE, and EFFRON concur.

# UNITED STATES COURTS
## of
# CRIMINAL APPEALS