**UNITED STATES, Appellee,**

v.

**Sergeant Mark A. ARAB, United States Army, Appellant.**

**ARMY 9801645.**

U.S. Army Court of Criminal Appeals.

21 May 2001.

For Appellant: Captain Mary C. Vergona, JA (argued); Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA; Major Kirsten V.C. Brunson, JA; Captain Arun J. Thomas, JA (on brief); Lieutenant Colonel David A. Mayfield, JA; Major Mary M. McCord, JA; Captain Stephanie L. Haines, JA.

For Appellee: Captain Karen J. Borgerding, JA (argued); Lieutenant Colonel Edith M. Rob, JA (on brief); Major Anthony P. Nicastro, JA.

Before CAIRNS, Senior Judge, BROWN, and VOWELL, Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of six specifications of assault consummated by a battery, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 [hereinafter UCMJ].[1] He sentenced the appellant to a bad-conduct discharge, confinement for twenty-four months,

---

1. This included one finding of assault consummated by a battery as the lesser included offense

forfeiture of all pay and allowances, and reduction to Private E1, and directed that the appellant receive thirty-four days credit against his sentence to confinement for time served in civilian pretrial confinement for the same offenses. The convening authority approved the adjudged sentence, but neglected to order the confinement credit in his initial action.[2]

This case is before this court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866. In six assignments of error, the appellant asks us either to dismiss all charges and specifications based on constitutional and regulatory violations of the appellant's right to a speedy trial or to find his conviction of all offenses legally and factually insufficient. We resolve all issues against the appellant.

## I.  SPEEDY TRIAL

### A.  Facts

The appellant was arrested by civilian authorities on 3 July 1997, and was held in confinement pending civilian charges until 6 August 1997, a period of thirty-four days. Upon his return to military control, the appellant was prohibited from leaving Fort Huachuca, Arizona, without an escort. He apparently remained so restrained until the conclusion of his trial on 28 October 1998.

The appellant was arraigned on 15 September 1998, 405 days after imposition of military restraint on 6 August 1997.[3] In litigating a defense motion to dismiss all charges and their specifications based on a denial of the appellant's right to speedy trial, the parties stipulated to certain events and periods of delay. The military judge made additional findings of fact regarding excludable delays. The table below summarizes the factual findings made or adopted by the military judge.

| Dates | Event | Days Excluded |
|---|---|---|
| 6 Aug. 97 | R.C.M. 304 restraint begins | |
| 18 Aug. 97 | Charges preferred | |
| 5 Sep. 97 | Defense request for delay in Article 32(b), UCMJ, hearing until 20 Oct. 97 granted | 46 |
| 20 Oct. 97 | Defense requests first sanity board | |
| 28 Oct. 97 | First sanity board granted | |
| 22 Dec. 97 | First sanity board results received | 56 |
| 26 Jan. 98 | Defense request for delay to 11 Feb. 98 for Article 32(b), UCMJ, hearing granted | 17 |
| 12 Feb. 98 | Article 32(b), UCMJ, hearing conducted | |
| 24 Mar. 98 | Government requests a second sanity board | |
| 26 Mar. 98 | Second sanity board ordered | |
| 12 Aug. 98 | Results from second sanity board received | 140 |
| 14 Aug. 98 | Charges referred | |
| 17 Aug. 98 | Referred charges served on the appellant | |
| 17 Aug. 98 | Government submits docketing request asking for a trial date of 23 Aug. 98; military judge sets a trial date of 17 Sep. 98 | 30 |
| 15 Sep. 98 | Appellant arraigned | |

of maiming and three findings by exceptions and substitutions to charged offenses of assault with a means likely to cause grievous bodily harm. The military judge acquitted the appellant of one additional specification of aggravated assault and one specification of indecent assault.

2.  Army Regulation 27–10, Legal Services: Military Justice, para. 5–28a (24 June 1996), requires convening authorities to reflect such credit in their initial action on courts-martial. We will correct this omission in our decretal paragraph.

3.  Although the appellant was confined in the Cochise County Jail between 3 July 1997 and 6 August 1997, the military judge found no evidence that he was confined at the request of the Army, and thus excluded this period from the Rule for Courts–Martial 707 [hereinafter R.C.M.] computation. We concur with both his factual finding and legal conclusion that this period is properly excluded from the R.C.M. 707 speedy trial accounting. We find no abuse of discretion in the military judge's determination that the military restraint that began after the appellant's release from civilian custody triggered the R.C.M. 707 speedy trial clock.

| | |
|---|---|
| Total days excluded | 289 |

Days of speedy trial accountability under R.C.M. 707
(405 − 289 = 116) — 116

In his motion to dismiss all charges and specifications based on lack of a speedy trial, the appellant argued that both the decision to conduct the second sanity board and the period of time required to conduct it were unreasonable. The second sanity board was ordered because the government, unsatisfied with the opinion of the two local psychologists who comprised the first board,[4] asked a forensic psychiatrist at Walter Reed Army Medical Center to review the board's conclusions. Armed with this psychiatrist's opinion that the findings of the first sanity board were not supported by the evidence, the trial counsel requested a second sanity board, and the special court-martial convening authority ordered the second R.C.M. 706 inquiry.

With regard to the length of time taken by the second sanity board, the documentary evidence considered by the military judge established that the second sanity board was very thorough. In addition to examining the appellant twice in the Washington, D.C., area, the board members reviewed a variety of documentary evidence, including the Article 32(b), UCMJ, transcript of the psychologists' testimony, the family advocacy case records, the appellant's medical records, the results of various psychological testing previously conducted, and additional psychological tests. The board members also interviewed several witnesses and the appellant's mother. The second sanity board adopted the findings of the first sanity board that the appellant suffered from a severe mental disease or defect, but came to the opposite conclusion regarding the nexus between the appellant's schizophrenia and post-traumatic stress disorder and the offenses. The second sanity board concluded that the appellant could appreciate the nature and quality of his actions and the wrongfulness of his conduct at the time of the offenses.

Two days after receipt of the report of the second sanity board, the charges and specifications were referred to trial by general court-martial. In a docketing request dated 17 August 1998, the trial counsel noted the speedy trial issue and requested a trial date of 23 August 1998. On 18 August 1998, the defense counsel concurred in the requested trial date. The military judge docketed the case for 15 September 1998. The record does not reflect why this particular trial date was selected, but the military judge noted that he had approved the delay between 18 August 1998 and the date the appellant was arraigned.

### B. Law

In reviewing the military judge's denial of the appellant's motion to dismiss the charges for lack of a speedy trial, we will review the military judge's factual findings with substantial deference, and will reverse them only for clear error. *United States v. Doty*, 51 M.J. 464, 465 (1999) (citations omitted). Whether the appellant actually received a speedy trial is a conclusion of law, which we review de novo. *Id.*

The appellant contends, as he did at trial, that the military judge abused his discretion in excluding the time to conduct the second sanity board from R.C.M. 707 speedy trial accountability. The appellant argues for the first time that the military judge also abused his discretion when he excluded the thirty-day delay created by the military judge's docketing decision and that the docketing decision itself was an abuse of discretion. Additionally, the appellant asserts that the special court-martial convening authority abused his discretion in granting an open-ended delay to conduct the second sanity board. Finally, citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the appellant argues that his constitutional right to a speedy trial was violated by the 439 days between his arrest by civilian authorities and his arraignment. We hold that the convening authority and the military

---

4. The two psychologists concluded that the appellant suffered from a severe mental disease or defect and, as a result, was unable to appreciate the nature and quality or the wrongfulness of his conduct.

judge did not abuse their discretion in granting the challenged periods of delay, that the delays were properly excluded from R.C.M. 707 speedy trial accountability, and that the appellant was not denied his constitutional or statutory right to a speedy trial.

### 1. R.C.M. 707 Analysis

■ The threshold requirement for excluding any period of time from speedy trial accountability under R.C.M. 707(c) is whether a delay was in fact granted by a person authorized to grant such a delay. Prior to referral, a convening authority may grant a requested delay. R.C.M. 707(c)(1). After referral, a military judge may grant a requested delay. *Id.* The record establishes that prior to referral, the appellant's brigade commander, the special court-martial convening authority, granted periods of delay for both the first and second sanity boards.[5] We find that the delay to conduct the second sanity board was granted by a person with the authority to do so. We likewise find that the military judge was the proper authority to approve the delay between 18 August 1998 and the date the appellant was arraigned.

The second issue is whether granting the delays constituted an abuse of discretion. *United States v. Weatherspoon*, 39 M.J. 762, 766 (A.C.M.R.1994). We hold that they did not.

■ The special court-martial convening authority was provided sufficient information to question the reliability of the conclusions made by the first sanity board, thus warranting a second examination. We find no abuse of discretion in the special court-martial convening authority's decision to grant the delay. While 140 days is an unusually long time for a sanity board to conduct an examination and to make a report, the record reflects due diligence on the part of the government and the board members. As our superior court noted in *United States v. Kossman*, 38 M.J. 258, 262 (C.M.A.1993) (citation omitted), reasonable diligence, not constant motion, is the appropriate yardstick against which periods of delay are measured.

■ At trial, the appellant did not challenge the thirty-day period between 18 August 1998 and the date the appellant was arraigned. Government appellate counsel urge us to consider this issue waived because the defense failed to assert it at trial. *See United States v. King*, 30 M.J. 59, 66 (C.M.A. 1990); *see also* R.C.M. 907(b)(2)(A) (providing that speedy trial motions may be waived). We agree that the issue was waived.

Assuming, arguendo, that the issue was not waived, we find that a delay of thirty days between a docketing request and arraignment is not, per se, unreasonable. Because there was no defense challenge at trial, the record is silent as to why the trial was docketed for 15 September 1998. We judicially note that Fort Huachuca, the place of trial, does not have a regularly assigned military judge, and that the judge who heard the speedy trial motion was not the same judge who received the docketing information and scheduled the case for trial. While a docketing decision by a military judge impacting on an appellant's right to a speedy trial is reviewable for an abuse of discretion, we find no evidence of such an abuse of discretion in this case.

■ The third issue is whether the military judge abused his discretion by excluding the challenged periods of delay from the speedy trial clock. We hold that the military judge did not abuse his discretion by excluding from the speedy trial clock the thirty-day period between 18 August 1998 and the date the appellant was arraigned and the 140–day period used to conduct the second sanity board and to document its result.

### 2. Constitutional Right to a Speedy Trial

■ The appellant's contention that the 438 days between his arrest by civilian authorities and the time of his arraignment violated his constitutional right to a speedy trial is similarly without merit. Citing specifically the period of time to complete the second sanity board, and using the four fac-

---

5. While the appellate exhibits document an implicit approval of the government's request for a delay to conduct a second R.C.M. 706 inquiry, and the military judge so found at trial, the allied papers contain an explicit approval of the government's request for a delay in order to conduct the second sanity board.

tors set forth in *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. 2182, the appellant argues that he was subjected to an unreasonable delay. Applying those four factors, i.e., the length of the delay, the reason for the delay, an assertion of the right to a speedy trial, and prejudice, to the case sub judice, we find no denial of the appellant's sixth amendment rights.

We have already determined that there was no abuse of discretion in ordering a second sanity board and that the period of time to complete the second sanity board was reasonable under the circumstances. There is no evidence that the request for the second sanity board was frivolous or made in bad faith. *See generally United States v. Nix*, 15 U.S.C.M.A. 578, 582, 36 C.M.R. 76, 80, 1965 WL 4788 (1965) (citations omitted). We note that the appellant made no demand for immediate or speedy trial and apparently voiced no complaints about the delay in completing the second sanity board before the results were received.[6] While being restricted to the limits of Fort Huachuca for over a year may well have caused some degree of personal hardship, the appellant was unable to demonstrate any specific prejudice stemming from the delay.[7] We hold that the appellant was not denied his constitutional right to a speedy trial.

## II. LEGAL AND FACTUAL SUFFICIENCY

### A. Facts

The charges in this case stemmed from the decidedly peculiar marital relationship between the appellant and his wife, Christine, a German citizen. They met in 1992 while the appellant was stationed in Germany and were married in 1995 in Arizona after Christine joined the appellant there.

Christine testified at trial that prior to their marriage, the appellant had slapped her once, but otherwise did not hurt her during their sexual relationship. One time prior to their marriage, the appellant told her he wanted to carve his name in her leg, and said that if she loved him, she would let him do it. She refused, and the appellant honored her refusal.

After their marriage, she and the appellant voluntarily engaged in sexual practices that involved bondage, burning,[8] slapping, and hair pulling on a frequent basis. In each case, the appellant was the "actor" and Christine was the recipient or "victim." Although Christine enjoyed some aspects of these activities, there were occasions prior to the events giving rise to these charges when the appellant's activities frightened her. However, when she cried or asked him to stop during the course of their intimacies, he refused by telling her that she liked what he was doing. She attempted to discuss her concerns with him afterwards on several occasions, explaining that she was frightened, but the appellant seemed oblivious to what she was saying. She specifically told him that she did not like his actions during fellatio because they caused her to choke and made it difficult to breathe. She also told him on occasion that burning her with cigarettes hurt, but he would not stop either activity. When she cried, he would slap, hit, or choke her. Christine testified that she believed the appellant knew where the line was between what she liked and what scared her and that he sometimes went over it, implying that he did so deliberately.

On 24 June 1997, the appellant, who had been drinking, came home around 2200 hours. He ordered Christine to take off all her clothes and then tied her hands behind her back with plastic bands. Although no

---

6. The trial defense counsel's comments on the docketing form that he intended to file a motion to dismiss based on speedy trial and that the military judge should consider R.C.M. 707 in setting a trial date do not amount to a demand for speedy trial.

7. The trial defense counsel argued that the appellant's memory was affected by the passage of time between the dates charged and the time of trial. We are unable to assess the extent, if any,

of a memory loss because the appellant chose not to testify on his own behalf, and he did not assert that his decision was based, in whole or in part, on any memory loss. We also note that the appellant claimed no memory of the events in question when he was arrested by civilian police for the assaults on his wife.

8. Christine testified that she enjoyed "light" cigarette burns inflicted upon her by the appellant.

similar items were introduced at trial, Christine's description and the photographic evidence of ligature marks indicate that these bands either resembled the locking flexible plastic bands sometimes used as handcuffs by police agencies or the locking plastic straps used to tie garbage bags. The use of these bands was new, as the appellant had always previously used "550 cord" to tie her up. On this occasion, she was tied so tightly that her hands went numb. He ordered her to lie down on the floor and had her perform fellatio on him, during which he forced deep penetration. She tried to talk with him and asked him to stop. He responded by poking her in the eyes with his fingers.

He then dragged Christine into the bedroom by her hair and directed her to straddle him. While they had sexual intercourse, he slapped her and made small cuts on her abdomen with a knife. He then burned her repeatedly with a cigarette, including burns on her nipples, a row of burns in a line extending from her upper chest between her breasts down to her abdomen, and various scattered burns along her upper torso. After burning her, the appellant made Christine turn over, sat on her legs, and carved his name "MARK" in block letters on her left buttock. Pictures taken over a week later clearly reflected the appellant's name incised on her buttock and a series of burns on her torso that were deeper than surface or superficial skin burns. Christine testified that during the events on 24 June, she cried, told the appellant "no," and asked him to stop. After carving his name in her buttock, the appellant untied her and went to bed. She applied first aid cream and bandages to herself and went to bed as well.

On 2 July 1997, after an argument, Christine fled with their daughter to a shelter for battered spouses and children and remained there overnight. The appellant located her there on 3 July 1997, and after twice refusing his calls, she agreed to talk with him. During the phone conversation, the appellant used a ruse to induce Christine to return to their apartment, claiming she needed to pick up her belongings because he was giving up the apartment.

Once Christine entered the apartment, the appellant's ruse became apparent. He sent their daughter to her room and ordered Christine to undress. Explaining that he was going to make her pay for taking their daughter to a shelter, he again tied her hands with plastic straps. Christine cried and asked him to let her go; the appellant told her to shut up and slapped her. The phone rang, and before he answered the call, the appellant told Christine that if anyone heard her crying, she would pay. After the call, the appellant, claiming that she was dirty from her night in the women's shelter, dragged Christine by her hair into the shower and forcibly washed her, including vigorous scrubbing of the areas he had burned several days earlier. Their daughter came into the bathroom, and witnessed her mother being sprayed by some type of water gun or hose before the appellant said something to her that made her return to her room.

The appellant then dragged Christine by her hair into the bedroom where he had sexual intercourse with her while her hands remained tied behind her back, with her knees, shoulders, and face resting on the bed. While having sexual intercourse, the appellant stabbed Christine in the buttock with a knife. Afterwards, the appellant untied Christine and told her that he was going snake hunting with a friend and that she had better be there when he returned. He cut the plastic cuffs and left the house, taking a gun.

After he left, Christine fled to a neighbor's home, and thereafter went to the local police to file a report. Police photographs admitted at trial documented facial contusions and abrasions, the cigarette burns, the name "MARK" carved into her left buttock, the stab wound in her other buttock, and ligature marks around Christine's wrists. During a statement taken by the investigating officer, Christine denied previous voluntary participation in "rough sex" with the appellant. At trial, she explained that this false denial was the result of her embarrassment at the prospect of disclosing their previous activities.

After the appellant's arrest by civilian authorities, he told the arresting officer that he

did not remember what had happened between him and his wife.

### ° B. Discussion

#### 1. *Standard of Review*

■ When reviewing a case for legal sufficiency, the standard of review is whether, viewing the evidence in a light most favorable to the prosecution, any rational factfinder could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Reed,* 54 M.J. 37, 41 (2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 780, 148 L.Ed.2d 677 (2001). This court " 'is bound to draw every reasonable inference from the evidence of record in favor of the prosecution.' " *United States v. McGinty,* 38 M.J. 131, 132 (C.M.A.1993) (quoting *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A. 1991)).

■ On the other hand, when testing for factual sufficiency, this court must, after weighing the evidence and making allowances for not having seen the witnesses in person, be convinced that an accused is guilty beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); *see also United States v. Scott,* 40 M.J. 914, 917 (A.C.M.R.1994), *aff'd,* 42 M.J. 457 (1995). We accord no greater degree of deference in this regard to a military judge sitting as a trier of fact.

#### 2. *Legal and Factual Sufficiency*

Before this court, the appellant first argues that Christine actually consented to the appellant's actions on 24 June and 3 July 1997. Pointing to their prior sadomasochist marital relationship, the appellant claims that if Christine did not actually consent, he honestly and reasonably believed that she did. Rule for Courts–Martial 916(j) establishes the parameters of the mistake of fact defense: if the facts as the appellant believed them to be constituted a defense, his honest and reasonable mistake as to those facts would also be a defense. This case thus intertwines questions of fact and law. If the law recognizes consent as a defense to being cut, burned, and stabbed in the manner set forth in the findings, we must address the issue of whether the appellant honestly and reasonably believed Christine was consenting. Alternatively, if we find that consent is not a defense to batteries of this nature, the appellant's beliefs as to consent are irrelevant. Factually, if we find beyond a reasonable doubt that the appellant did not either honestly or reasonably believe that his wife was consenting, we need not determine if consent would constitute a defense.

Article 128(a), UCMJ, provides in pertinent part: "Any person subject to this chapter who attempts or offers with *unlawful force* or violence to do bodily harm to another person . . . is guilty of assault and shall be punished as a court-martial may direct" (emphasis added). The *Manual for Courts–Martial, United States* (1995 ed.), Part IV, para. 54c(1)(a) [hereinafter MCM, 1995], defines assault as "an attempt or offer with unlawful force or violence to do bodily harm to another . . . . done without legal justification or excuse and without the *lawful consent* of the person affected" (emphasis added). "Bodily harm" is defined as "any offensive touching." *Id.*

Consent of the ostensible victim affects two aspects of the crime of assault consummated by a battery. First, consent may determine whether a particular touching is offensive. *See United States v. Greaves,* 40 M.J. 432, 433 (C.M.A.1994). An honest and reasonable mistake of fact as to the victim's consent to being touched may be a defense to this aspect of a touching. *United States v. Johnson,* 54 M.J. 67, 69 (2000) (finding a conviction of assault consummated by a battery legally insufficient because the victim's failure to clearly manifest her lack of consent to backrubs in an office setting did not place the appellant on notice that she did not in fact consent); *see also* R.C.M. 916(j).

Second, consent may impact on the lawfulness of the touching, as the phrase "lawful consent" illustrates. Actual consent may convert what would otherwise be a battery into a noncriminal activity. Without consent, a kiss may be a criminal offensive touching. *See United States v. Sever,* 39 M.J. 1 (1994). With consent, the same conduct is not criminal. Where there is no actual consent, but

the activity is one that, with consent, would be lawful, an honest and reasonable belief that the person touched was consenting would be an affirmative defense. *See Johnson*, 54 M.J. at 69; *Greaves*, 40 M.J. at 433.

Actual consent, however, does not render what would otherwise be a battery lawful under all circumstances. Consent is not a defense available to those participating in a mutual affray, although consent excuses from criminal prosecution similar conduct in the sporting arena. *See United States v. Wilhelm*, 36 M.J. 891, 893 & n. 4 (A.F.C.M.R. 1993); *see also* W.E. Shipley, Annotation, Consent as Defense to Charge of Criminal Assault and Battery, 58 A.L.R.3d 662 (1974). Public policy concerns also affect the lawfulness of a touching; those engaged in a mutual affray may each have consented to being struck by the other, but as a matter of public policy, such consent does not render the resulting batteries lawful. *Wilhelm*, 36 M.J. at 893. The law protects a societal interest in ensuring its members are free from injury or harm, and protects the public from exposure to such affrays and disorders.

What constitutes "lawful consent" may be far removed from actual consent. *See United States v. Bygrave*, 46 M.J. 491, 493 (1997) (finding the victim's consent to sexual intercourse with her HIV-positive lover not "legally cognizable"). As we see the issues in this case, we must determine: (1) whether consent, if any, in this case was legally cognizable; (2) if such consent could form the basis for a defense, whether Christine actually consented; and (3) if she did not consent, whether the government proved beyond a reasonable doubt that the appellant was not honestly and reasonably mistaken about Christine's lack of consent.

■■■ Addressing the second issue first, and applying our fact-finding powers under Article 66(c), UCMJ, we are satisfied beyond a reasonable doubt that Christine did not actually consent to being cut, burned, stabbed, or dragged by the hair on either of the two dates charged.

■■■ With regard to the batteries occurring on 3 July 1997, we find that the appellant did not have an honest or a reasonable belief that Christine consented to being stabbed in the buttock, or that she consented to being dragged by her hair between the living room, the shower, and the bedroom. Christine's reluctance to meet with the appellant and the appellant's use of a ruse to get Christine back into the apartment, coupled with his statements that he was punishing her for her flight to a women's shelter with their daughter, evidence the appellant's motive and intent to physically harm his wife as a means of revenge. The appellant could not possibly entertain any mistake as to her lack of consent to his acts. This factual finding obviates the need to address whether consent (or an honest and reasonable belief as to consent) would constitute a defense to assaults of this nature.

■■■ With regard to the remaining assaults on 24 June 1997, we find it necessary to address the first issue—the relationship between the defense of consent and the offense of assault consummated by a battery. As earlier discussed, consent may be a defense to an assault consummated by a battery, but the defense has a number of exceptions. As discussed in *Wilhelm*, 36 M.J. at 893, consent is not a defense when the parties are engaged in a mutual affray. Likewise, when the assault involves a means likely to produce death or grievous bodily harm, the law does not recognize consent as a defense. *Bygrave*, 46 M.J. at 494. In an early decision interpreting Article 128, UCMJ, the Air Force Board of Review refused to recognize consent as a defense to an allegedly sadomasochistic battery when the assaultive behavior disturbed the peace. *See United States v. Holmes*, 24 C.M.R. 762, 765, 1957 WL 4876 (A.F.B.R.1957).

■■■ Neither *Bygrave* nor *Holmes* dealt with consent within a marital relationship, however.[9] Military courts have suggested, without deciding, that the constitutional right

---

9. At the time of trial, Boatswain's Mate Bygrave was married to the victim of the "consensual" aggravated assault. They were not married when she became infected with HIV as the result of their unprotected sexual intercourse.

to privacy [10] may protect activities otherwise constituting a crime if done within a marital relationship. *See, e.g., United States v. Henderson,* 34 M.J. 174, 178 n. 6. (C.M.A. 1992) (upholding the constitutionality of the Article 125, UCMJ, 10 U.S.C. § 925, prohibition against consensual sodomy in a non-marital context, while intimating that the result might be different in a marital one); *United States v. Hall,* 34 M.J. 695, 699 (A.C.M.R.1991) (finding Article 125, UCMJ, constitutional, but leaving open the question of its constitutionality as applied to a married couple), *rev'd on other grounds,* 36 M.J. 80 (C.M.A.1992). On the other hand, some previously protected marital activities have been criminalized. Following the lead of many state legislatures, the UCMJ was amended in 1992 to remove the longstanding marital exception to rape. National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, § 1066(c), 106 Stat. 2315, 2506 (1992).

The issue of what constitutes "unlawful force or violence" is affected by the family setting in which it occurs. What might otherwise be a criminal battery may be permissible within a family setting. For example, military law recognizes the affirmative defense of parental discipline in the case of an assault consummated by a battery when committed by a parent against a child. *United States v. Brown,* 26 M.J. 148, 150 (C.M.A. 1988). The defense, however, is not absolute. Balancing parental discipline against societal interests in the safety and well being of its children places limits on the defense. The defense applies only when the force used is for the purpose of discipline and is reasonable. *United States v. Robertson,* 36 M.J. 190, 192 (C.M.A.1992). The test is whether the force used carries a substantial risk of serious bodily injury, and actual harm need not be demonstrated. *United States v. Rivera,* 54 M.J. 489, 492 (2001); *see also United*

*States v. Scofield,* 33 M.J. 857, 862 (A.C.M.R. 1991) (holding that the defense of parental discipline will not lie when the parent uses force that creates a substantial likelihood of death, serious injury, disfigurement, or extreme pain).

Military courts have also considered the military status of the victim in determining whether consent renders a battery lawful. In *Bygrave,* 46 M.J. at 496, our superior court relied, at least in part, on the military status of the victim in holding that her consent to sexual intercourse with an HIV positive soldier was not legally cognizable, based on the government's compelling interest in her health and safety.

While Christine was not a soldier, as a military family member eligible for medical care and treatment at military medical facilities, there is a reasonable degree of military interest in her physical well being. This governmental interest was also a factor cited by our superior court in *Bygrave,* 46 M.J. at 496. *See also Rivera,* 54 M.J. at 492 ("[W]e expect our military members to take care of their families."). The Army's family advocacy programs reflect the strong correlation between family violence or dysfunction and soldiers' abilities to properly perform their military duties. *See* Army Reg. 608–18, Personal Affairs: The Army Family Advocacy Program (1 Sep. 1995). Additionally, some of Christine's injuries, including the facial contusions and abrasions, the ligature marks, and some of the cigarette burns, were open and visible to a casual observer. Such visible injuries would be likely to evoke comment or query, and could lead friends and neighbors to form a negative opinion of her soldier-husband.

Surprisingly, there is a dearth of published case law—civilian or military—regarding the defense of consent to charges arising from sadomasochistic relationships in a marital setting.[11] Most cases deal with other-than-

---

10. The United States Supreme Court has recognized the right to privacy in reproductive or sexual behavior in a number of opinions. *See, e.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (upholding the right of married persons to use contraceptives); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (extending the right to contraceptive use to unmarried couples). *But*

*see Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (finding no constitutional right for homosexual couples to engage in sodomy).

11. Our superior court has considered at least one spousal assault and battery case where the parties both contended that the acts were done with consent. *See United States v. Haner,* 49 M.J. 72

marital relationships. In *Commonwealth v. Farrell*, 322 Mass. 606, 78 N.E.2d 697 (1948), cited with approval by our sister service court in *Holmes*, 24 C.M.R. at 764–65, the Supreme Judicial Court of Massachusetts held that consent is not a defense when a battery is done with such violence that bodily harm is likely. In *Farrell*, an Army officer assaulted a civilian girlfriend by inflicting shallow, bleeding cuts with a razor blade and burning his initials into her torso, thighs, and buttocks with cigarettes. In 1980, the same court reiterated its position that the right to sexual privacy, albeit in a non-marital relationship, was outweighed by the State's interest in preventing violence using dangerous weapons against its citizens. *See Commonwealth v. Appleby*, 380 Mass. 296, 402 N.E.2d 1051 (1980). *Appleby* involved one partner beating another with a riding crop, ostensibly for sexual gratification. Although a weapon was used, there was no evidence that serious bodily injury was inflicted. In yet another case, Iowa's Court of Appeals interpreted the Iowa assault and battery statute to preclude consent to sadomasochistic activities, finding the statutory exception for participation in "social activities" inapplicable. *State v. Collier*, 372 N.W.2d 303 (Iowa Ct.App.1985).

In *State v. Brown*, 143 N.J.Super. 571, 364 A.2d 27, 31–32 (Law Div.1976), *aff'd*, 154 N.J.Super. 511, 381 A.2d 1231 (App.Div. 1977), an often-cited case involving consensual batteries in a marital setting, the Superior Court of New Jersey, Law Division, held:

[A]s a matter of law, no one has the right to beat another even though that person may ask for it. Assault and battery cannot be consented to by a victim, for the State makes it unlawful and is not a party to any such agreement between the victim and perpetrator. To allow an otherwise criminal act to go unpunished because of the victim's consent would not only threaten the security of our society but also might tend to detract from the force of the moral principles underlying the criminal law.

In *Brown*, the defendant claimed his wife, who was an alcoholic, had consented to being assaulted when she drank as an inducement to remaining sober.[12] The court concluded that even private acts between a husband and wife could be criminally punished "because these acts (the physical assaults, by defendant upon Mrs. Brown), even if done in private, have an impingement (whether direct or indirect) upon the community at large in that the very doing of them may tend to encourage their repetition and so to undermine public morals." *Brown*, 364 A.2d at 29.

Like our superior court in *Bygrave*, we recognize that a right to privacy in a marital relationship certainly exists in a military context as well as a civilian one. We are unwilling, however, to recognize consent as a defense to the appellant's acts which caused injuries of the nature and scope sustained by Christine, even though the appellant's acts may not have constituted aggravated assaults. Borrowing from the rationale of the parental discipline cases, the means the appellant used and the nature of the injuries he inflicted suggest that Christine was subjected to a substantial likelihood of disfigurement or extreme pain. *See Rivera*, 54 M.J. at 492; *Scofield*, 33 M.J. at 862.[13] In making this

---

(1998). In *Haner*, the wife had made excited utterances to police officers after the appellant had bound, cut, beaten, whipped, and sexually assaulted her, and the victim made similar complaints to a treating physician and to Air Force investigators. These statements were admitted at trial after the wife recanted, and she and the appellant both testified that the beatings were part of sadomasochistic sexual activities in which they engaged as a married couple. The issue on appeal was the evidentiary ruling of the military judge admitting the wife's out-of-court statements, not the issue of consent as a defense. The case is of limited value in determining our superior court's position on consent as a defense, for the trier of fact may well have rejected the witnesses' testimony that the events were consensual.

12. The opinion refers to the nature of the assault as an "atrocious assault and battery," and further comments that the defendant severely beat his wife "with his hands and other objects." *Brown*, 364 A.2d at 28. It is difficult to ascertain if the injuries were so severe as to fall under the general rule that one may not consent to an aggravated assault. The lengthy discussion suggests that the holding is not limited to assaults with a means likely to cause grievous bodily harm or assaults in which grievous bodily harm is actually inflicted.

13. In considering the parental discipline cases, we do not mean to suggest that we view the masochistic partner in a sadomasochistic relationship as childlike. Rather, we consider reasonable the balance struck between the compel-

determination, we have also considered the military and governmental interest in protecting military family members from harm, the entitlement of family members to military medical care, the circumstances in which the acts occurred, the visible and lasting [14] nature of some of the injuries, the involvement of local authorities, and the fact that weapons were used in inflicting the injuries. While the military judge did not find the appellant guilty of aggravated assault based on either the nature of the injuries sustained or the means used to inflict the injuries, our review of the victim's testimony and the exhibits documenting the injuries convinces us that, whatever the limits are to the degree of sadomasochism legally permissible in a marital relationship, Christine's injuries on 24 June 1997 exceeded them. We need not decide today exactly where the line is drawn on "lawful consent" or "unlawful force or violence." We are satisfied that the appellant's conduct was well beyond it.

Assuming, arguendo, that Christine could lawfully consent to the injuries inflicted on 24 June 1997, we will address the third question posed: whether the government proved beyond a reasonable doubt that the appellant did not honestly and reasonably believe Christine was consenting.

We conclude that any subjective belief the appellant may have entertained that Christine was consenting was not objectively reasonable. The appellant could not have reasonably believed that Christine consented to having him carve his name in her buttock. She had previously refused him permission to carve his name on her leg, and she testified that she cried and protested when he was cutting the letters into her flesh. Since he was sitting on her thighs and her hands were restrained with plastic straps, she was unable to do more without risking more serious injury. She testified, and the photographic evidence confirms, that the depth and extent of the cutting on this occasion exceeded light cuts or knife "scratches" to which she had previously consented.

The other events on 24 June 1997 present a closer issue, particularly given the parties' history of "rough sex" and Christine's testimony that she had previously permitted the appellant's administration of light cuts and burns during sexual activities. Christine also testified, however, that cigarette burns were one of the forms of sadomasochistic activity she had tried to talk to the appellant about on several occasions, explaining that his actions went beyond what she wanted. The cigarette burns inflicted on 24 June 1997 exceeded the number and depth of those administered on previous occasions. Although Christine could have, as appellate defense counsel suggest, simply rolled off the appellant as he administered the burns, she remained handcuffed during the episode and there is no indication that trying to resist would have caused the appellant to cease hurting her. Earlier that evening, when she protested the force he used during fellatio, the appellant responded to her protests by poking her in the eyes with his fingers. Given Christine's unrebutted testimony that she had, on occasions not involving sex, explained that she did not like things that hurt her, we find that any belief the appellant may have entertained that she consented to the deep cigarette burns on 24 June 1997 was unreasonable.

We cannot, however, find beyond a reasonable doubt that the appellant did not have an honest and reasonable belief that Christine consented to the scratches inflicted on her torso with the appellant's knife. These scratches were administered before the cigarette burns and the carving of appellant's name in her buttock. There was no testimony that these scratches exceeded in number or degree those the appellant had previously inflicted upon Christine with her consent. While she testified that she protested on this occasion, the fair implication of her testimony

---

ling governmental interest in the safety and well being of society's minor citizens and the rights of parents to discipline their children, and apply some aspects of that balancing of interests to limit what military society will recognize as lawful consent in a sadomasochistic marital relationship.

14. Christine testified that the scars from the burns and the name-carving persisted for some time, but had faded by the time of trial. She retained, however, the scar from the stab wound to her buttock.

was that she protested on other occasions as well, but as part of the sexual play, rather than in earnest. If our earlier legal conclusion that this activity is not one to which a person may lawfully consent is incorrect, this finding of guilty must be set aside because the evidence is factually insufficient, and the specification must be dismissed.

Applying the principles of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), we conclude that no sentence relief would be warranted, should this specification be dismissed. The scratching injuries inflicted pale in comparison to the beating, burns, and cuts Christine also sustained. We are satisfied beyond a reasonable doubt that this specification played no appreciable role in the highly appropriate sentence the appellant received.

We find the evidence to be legally and factually sufficient to support the findings of guilty as to all of the offenses. We have considered the other assignments of error, including the ones personally specified by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit. Accordingly, the findings of guilty and the sentence are affirmed. The appellant will receive thirty-four days' credit against his sentence to confinement.

Senior Judge CAIRNS and Judge BROWN concur.