# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and FLEMING
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant TERRACE L. SOLOMON**
**United States Army, Appellant**

ARMY 20160456

Headquarters, United States Army Alaska
Sean F. Mangan, Military Judge
Colonel Erik L. Christiansen, Staff Judge Advocate

For Appellant: Zachary Spilman, Esquire (argued); Captain Milton Augustus Turner, JA; Zachary Spilman, Esquire (on brief, reply brief, and brief on specified issues).

For Appellee: Captain Marc B. Sawyer, JA (argued); Colonel Steven P. Haight, JA; Major Hannah E. Kaufman, JA; Captain Marc B. Sawyer, JA (on brief); Colonel Steven P. Haight, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Marc B. Sawyer, JA (on brief on specified issues).

3 April 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Judge:

Following his convictions for various military violations and assaulting his spouse, WS, and their children, CS and TS, appellant claims the military judge improperly limited his cross-examination of WS to establish her motive to fabricate the allegations against him. Among his other claims, appellant asserts the military judge erred in failing to sua sponte instruct the members on the defenses of accident, automatism, and parental discipline as to some of the assault offenses. In this opinion, we discuss why the military judge erred in limiting defense counsel's cross examination, but determine any error was harmless. As for the instructions, we find the military judge erred in part and grant relief.

SOLOMON—ARMY 20160456

A panel of officer and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of violating an order from a superior commissioned officer, two specifications of insubordinate conduct towards a superior noncommissioned officer, one specification of assault consummated by battery of a child under the age of sixteen, three specifications of assault consummated by battery, one specification of simple assault, and one specification of using language that was prejudicial to good order and discipline and was of a nature to bring discredit on the armed forces, in violation of Articles 90, 91, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 890, 891, 928, 934 (2012) [UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for twelve years, total forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the finding of guilty to one assault and the Article 134, UCMJ, offense, and approved only so much of the sentence extending to a dishonorable discharge, confinement for three years, total forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority also credited appellant with 243 days against the sentence to confinement as directed by the military judge for pretrial confinement.

This case is before us under Article 66, UCMJ. Appellant raises eight assignments of error, but only two warrant discussion–the military judge's limitations on defense counsel's cross examination of WS and failure to instruct on certain defenses. We find the remaining assignments of error lack merit.[1] Pursuant

---

[1] Appellant avers the military judge prohibited defense counsel from conducting re-cross-examination of several witnesses and asks whether this deprived appellant of his Sixth Amendment right to confront the witnesses against him. Having reviewed the entire record, we find this allegation lacks merit.

In reviewing the record we do note the military judge questioned several witnesses, some of them extensively. Military Rule of Evidence [Mil. R. Evid.] 611(a) provides the military judge shall exercise "reasonable control over the mode and order of examining witnesses . . . ." Article 46, UCMJ, and Mil. R. Evid. 614 "provide wide latitude to a military judge to ask questions of witnesses called by the parties." *United States v. Acosta*, 49 M.J. 14, 17 (C.A.A.F. 1998). A "military judge may participate actively in proceedings to assure that court-martial members receive the information that they need to determine whether the accused is proven guilty, however, the military judge must take care not to become an advocate for either party." *United States v. Foster*, 64 M.J. 331, 332-33 (C.A.A.F. 2007) (citing *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995)). We are satisfied that the military judge's questioning did not put into doubt the "court-martial's legality, fairness, or impartiality." *Id.* at 333 (citing *United States v. Quantanilla*, 56 M.J. 37, 78 (C.A.A.F. 2001)). With that said, we take this opportunity to remind trial

(continued . . .)

to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), appellant asserts the military judge erred in failing to grant him confinement credit under Article 13, UCMJ, and pursuant to Rule for Courts-Martial [R.C.M.] 305(j)(2).[2] We find the Article 13 claim lacks merit and take remedial action regarding the government's non-compliance with R.C.M. 305 in our decretal paragraph.

## BACKGROUND

### A. Convening Authority Action

As will be seen, this court-martial was a mess on several levels. Before discussing the facts surrounding appellant's offenses, we are required to determine which specifications now remain before this court.

In his action, the convening authority purported to dismiss Specification 5 of Charge V, an offense under Article 128, UCMJ, and Specification 2 of Charge VI, the sole Article 134, UCMJ, conviction. The parties are in agreement that the convening authority dismissed appellant's sole conviction under Article 134, UCMJ. We agree.

Untangling the dismissed assault conviction is much harder. Appellant was convicted of five Article 128 specifications. Appellant was convicted of two specifications for assaulting his wife between on or about 1 December 2014 and on or about 31 December 2014. These two specifications arose from an incident between appellant and WS in their kitchen in mid-December 2014. One specification involved appellant unlawfully pushing WS with his hands and the second specification involved appellant unlawfully striking WS on the thigh with his fist. The parties agree that the convening authority dismissed the specification for

---

(. . . continued)
judges to consider the necessity of questioning witnesses at a members trial, as potential impartiality concerns can arise when the military judge continuously asks numerous questions of government witnesses prior to allowing the defense counsel cross-examination or providing the members with the opportunity to pose questions for

[2] We specified two issues to the parties for briefing: (1) whether the military judge erred in failing to provide administrative credit under R.C.M. 305; and (2) if error, what is the appropriate remedy (given that appellant has completed his sentence to confinement). The government conceded "the military judge erred by not sua sponte granting confinement credit once he found noncompliance with R.C.M. 305 and proposed providing appellant with 7 days of confinement credit. Appellant asserted the R.C.M. 305 violation occurred for 86 days. We agree with appellant.

unlawfully pushing WS with his hands.  However, after a thorough review of the charge sheet, the flyer, the findings instructions, the findings worksheet, the Report of Result of Trial (DD Form 2707-1), the Staff Judge Advocate's Post-Trial Recommendation (SJAR) and Addenda, the convening authority's action, and the promulgating order, we do not agree with the parties.  We instead find the convening authority dismissed a simple assault specification involving appellant's son, TS.[3]

This is how we arrived at our conclusion.

The government originally preferred seven charges (six charges and one additional charge) against appellant, encompassing numerous specifications.  The Article 128 allegations appeared under Charge V of the charge sheet and the Article 134 allegations fell under Charge VI.

After referral but before arraignment, the government dismissed Specification 1 of Charge IV (alleging a violation of Article 120, UCMJ), and Specifications 3 and 4 of Charge V (alleging a violation of Article 128, UCMJ).  Trial counsel, however, failed to appropriately renumber the charge sheet.  After completion of voir dire, trial counsel, as an afterthought, moved to dismiss various charges and specifications as reflected on the referred charge sheet.  The military judge granted this motion and the remaining charges and specifications, as renumbered, are those reflected on the flyer and findings worksheet provided to the members at trial.  What was Specification 5 of Charge V on the charge sheet, alleging a simple assault of TS, was numbered as Specification 3 of Charge III on the flyer.  What appeared as Specification 2 of Charge VI on the charge sheet (the Article 134, UCMJ, conviction), was renumbered as Specification 2 of Charge IV.  The flyer and findings worksheet did not reflect, and the members did not consider, a Charge V, Charge VI, or Additional Charge.

After trial, the SJA's office prepared the DD Form 2707-1, but listed the charges and specifications as they appeared on the charge sheet (minus the specifications dismissed prior to arraignment).  The remaining charges and specifications on the DD Form 2707-1 correspond to the charges and specifications as numbered on the charge sheet.  That is, Specification 5 of Charge V, alleging an assault of TS, is the same on both documents.

---

[3] It appears the confusion of the parties resulted from relying on the promulgating order in the case, General Court-Martial Order # 7, Headquarters, United States Army Alaska, Joint Base Elmendorf-Richardson, Alaska, dated 27 March 2017 (promulgating order).  This order is wrong, as the numbering does not match the charge sheet, the DD Form 2701-1, the flyer, or the findings worksheet.

The SJAR, dated 13 December 2016, recommended the convening authority approve the findings and sentence, and included the DD Form 2707-1 as the sole attachment.[4]  Subsequently, on 20 February 2017, civilian defense counsel submitted post-trial matters for consideration.  Defense counsel argued the convening authority should dismiss:  (1) appellant's conviction for assaulting his son, Specification 5 of Charge V (Specification 3 of Charge III on the findings worksheet) because the military judge erred in failing to provide the members a parental discipline instruction; and (2) appellant's Article 134 conviction, Specification 2 of Charge VI (Specification 2 of Charge IV on the findings worksheet).

In her Second Addendum, dated 16 March 2017, the SJA agreed with defense counsel and recommended that the convening authority dismiss Specification 5 of Charge V and Specification 2 of Charge VI.  The SJA stated "the defense counsel . . . alleges the military judge committed legal error by not instructing the members on the defense of parental discipline.  I agree.  Corrective action is necessary."  The TS assault specification was the only specification dealing with the defense of parental discipline.  In her Third Addendum, dated 27 March 2017, the SJA again reiterated her recommendation to dismiss this specification.

The convening authority, in his action dated 27 March 2017, dismissed Specification 5 of Charge V and Specification 2 of Charge VI.  It is clear to us that the convening authority's action was intended to dismiss the simple assault of TS and the sole Article 134, UCMJ, conviction, which appeared, respectively, as Specification 3 of Charge III and Specification 2 of Charge IV on the flyer and the findings worksheet.

### B. *Facts of the Offenses*

The charges and evidence adduced at trial portrayed appellant as an angry and abusive husband and father.  Appellant and WS married in 1999 and divorced in October 2015.  They had four children together, CS, MS, TS, and HS who were respectively fifteen, eleven, eight, and seven years old at the time of trial.

Specification 1 of Charge III[5] involved CS and occurred between on or about 25 October 2010 and 31 May 2012, when the family resided in Maryland.  CS

---

[4] The SJA's First Addendum, dated 18 January 2017, again recommending approval of the findings and sentence, included the DD Form 2707-1 and SJAR as attachments.

[5] Throughout this opinion, we reference the numbering of the charges and specifications as they appear on the flyer, findings instructions, and findings

(continued . . .)

testified that she and appellant would at times engage in "horseplay," "but sometimes he'd take it too far." One such occasion occurred in late-May 2012, when CS was nine or ten years old. While engaging in horseplay, appellant got on top of CS and gave her what he described as a "Charlie Horse." CS testified appellant clenched his fist with the middle knuckle protruding, which he then pressed into her chest "really hard." At trial, CS characterized this as a "sternum rub." CS began crying and asked appellant to stop. After about five minutes, appellant stopped. Appellant's sternum rub left CS with bruises on her chest, injuries later witnessed by WS.

The remaining charged assaults occurred when appellant was assigned to Joint Base Elemendorf-Richardson, Alaska.

Specification 2 of Charge III[6] alleged an assault of WS. On or about 6 May 2013, appellant and WS were in their bed, sleeping. WS awoke when appellant grabbed her wrists. Appellant grabbed and twisted her right wrist with enough force to cause it to pop. WS screamed at appellant that he was hurting her and to stop. Appellant eventually stopped and apologized. WS later treated her injured wrist by placing it in a cast.

---

(. . . continued)

worksheet. We do so to avoid any confusion caused by the failure of the military judge, trial counsel, and the chief of justice to ensure the referred charge sheet was properly annotated and renumbered at various junctures during the court-martial process. This specification appeared on the referred charge sheet, DD Form 2701-1, and promulgating order as Specification 1 of Charge V.

Trial counsel, like military judges, have a duty to protect the record so that it clearly reflects what occurred at trial. Likewise, chiefs of military justice, before signing a promulgating order on behalf of a convening authority or presenting the convening authority an action for signature that serves to dismiss a charge, have a duty to ensure these documents accurately reflect the findings of the members. In reviewing the record in this case, we are confident that the convening authority acted upon the findings of guilty announced by the members. Our lengthy exercise in connecting the dots would have been completely unnecessary had the appropriate level of diligence been exercised before, during, or after the trial by individuals involved with this court-martial.

[6] This appears on the referred charge sheet, DD Form 2701-1, and the promulgating order as Specification 2 of Charge V.

Specification 3 of Charge III[7] alleged an assault by offer on TS, appellant's then eight-year-old son. TS had a form of autism referred to as Asperger's syndrome. On 31 August 2013, appellant's children asked him to take them bike riding. Appellant, who had been drinking, initially declined the request. Appellant finally relented and told his children, "Get your asses out there to go for a bike ride." At the time, TS was "freaking out." TS instead stated "No," ran to his room, and locked the door. Appellant followed TS to his room, punched the door with his fist, and yelled, "I'm your dad. Don't tell me, 'No.' Fucking open this door." Appellant struck the door hard enough to injure his own wrist and damage the door. Appellant was charged with unlawfully assaulting TS by striking the door with his fist. Upon entering the room, appellant spanked TS. The government did not refer a charge of assault consummated by battery for spanking TS. TS apologized to appellant, though it appeared to WS that the boy sounded afraid of appellant. TS eventually went on the bike ride with appellant and his sisters.

Appellant's abusive conduct eventually led WS to leave home with the children for several weeks. During this time, they stayed with Master Sergeant (MSG) G and his wife. WS disclosed to MSG G and his wife some of the abuse she and the children had suffered. At some point during this absence, WS asked appellant for a divorce. However, after appellant sought therapy, WS and the children moved back home, as WS hoped she and appellant could reconcile.

Finally, Specifications 4 and 5 of Charge III[8] alleged assaults on WS. In December 2014, appellant and WS engaged in an argument that started over a parking ticket appellant had received. As the argument escalated, WS threw a piece of toast at appellant as she walked towards him. Appellant responded by grabbing WS's wrists and pulling her to the ground.[9] Appellant then held her down and punched WS in the thigh. Their daughter, CS, heard a noise like something heavy falling to the floor and later observed WS lying face down on the floor with her arms tucked in. CS saw appellant, who appeared "very mad" standing over WS.

---

[7] This appears on the referred charge sheet and DD Form 2701-1 as Specification 5 of Charge V and on the promulgating order as Specification 3 of Charge V.

[8] These appear on the referred charge sheet and DD Form 2701-1 as Specifications 7 and 8 of Charge V and on the promulgating order as Specifications 5 and 6 of Charge V.

[9] The convening authority's action, despite the positions taken by appellant and the government, did not dismiss this specification.

Following this assault, WS obtained a protective order against appellant from local authorities in Anchorage, Alaska. In WS's words at trial, "I was done." In January 2015, WS filed for divorce from appellant. In addition to the civilian protective orders, the Army issued a series of military protective orders to appellant and put conditions on appellant's liberty.[10]

Additional facts necessary to address appellant's assignments of error are set forth below.

## LAW AND DISCUSSION

### A. *Impeachment of WS at trial*

Appellant asserts the military judge erred in preventing defense counsel from questioning WS about a possible affair as a means of showing her motive to fabricate allegations against appellant. We disagree. However, although not expressly raised by appellant on appeal, we find the military judge erred in failing to allow this line of questioning as a means of impeachment by contradiction of WS's stated reasons for seeking a divorce from appellant.

During direct examination, the government asked WS about actions she took after the December 2014 assault in her kitchen. During this exchange, it became clear that this incident spurred WS to again seek a divorce from appellant:

> [TC]: At that point, were you sure whether it was time to cut and run and get a divorce or whether, you know, with therapy, you could get back together? What was your mindset? Were you sure it was over at that point?
>
> [WS]: I was done.

On cross-examination, trial defense counsel probed WS's reasons for seeking a divorce and tried to set a trap to impeach her. First, defense counsel revisited WS's first divorce filing in August 2013, which she withdrew after she and appellant went through marriage counseling. WS offered "I was – grew up being taught that divorce was not an option . . . ." Defense counsel next inquired about the January

---

[10] The findings of guilty for the charges under Articles 90 and 91, UCMJ, related to violations of these protective orders and conditions on liberty as well as disrespect towards a noncommissioned officer who gave appellant an order to report to his commander. We find these findings of guilty legally and factually sufficient. We did not include an exposé of the facts surrounding these offenses, as this was not necessary in resolving the issues addressed in this opinion.

8

2015 divorce filing and WS again acknowledged the final assault by appellant precipitated this action. Defense counsel then began to explore WS's relationship with TL, the husband of the principal at the school where WS worked. This drew an objection from trial counsel.

During the ensuing Article 39(a), UCMJ, session, civilian defense counsel proffered that WS began an affair with TL after the December 2014 assault but before the January 2015 divorce filing and would raise this affair ". . . to show that [WS] has a reason to try to hurt [appellant] and that her reasoning in filing for divorce was not that he had hurt her, rather, because she was having an affair with her boss's husband." In other words, the only difference in circumstances between the withdrawn August 2013 divorce filing and the January 2015 divorce filing was the existence of the affair with TL. Defense counsel argued that the affair also contradicted WS's claim that the December 2014 assault was the impetus for the divorce filing.

After considering the arguments of defense counsel and trial counsel, the military judge precluded defense counsel from questioning WS concerning the alleged affair with TL. The military judge found defense counsel had a good faith basis for this line of inquiry with WS and the questioning would potentially elicit proof of an affair. However, the military judge ruled that any probative value was minimal:

> In considering the likelihood that this will mislead the members against the probative weight of it, separate from the defense's ability to argue without the same facts and testimony that there may be a bias--some of which has already been established and I'm sure the defense will elicit more--in this witness to report, falsely, allegations for the benefit of securing divorce and favorable other results through civil proceedings, I find that the added fact of who she is having an affair with or that she's having an affair at all is substantially outweighed in its probative value--which I believe to be minimal--to show bias in light of its likelihood to confuse or mislead the members. So, therefore, under my M.R.E. 403 analysis, I'm sustained [sic] the government objection.

Following this ruling, defense counsel clarified his position on the relevance of the affair as a matter of impeachment by contradiction. The following colloquy ensued:

> CDC: And the fact it directly contradicts what she said, under questioning from the government—"Is [the

9

December 2014 assault] why you filed for divorce?"
"Yes, it is." And now we know that it was actually later
than that, only after she began an affair with another man,
that she filed for divorce. It completely--directly
contradicts----

MJ: It doesn't--no –I'm not going to find, as fact--and I
am not going to---- My conclusions with regards to the
contradiction that you allege is this: the defense has
evidence that has been elicited by this witness that she
chose to file for divorce, one on a certain date--and you're
free to impeach that by showing that's not true or may not
be true--secondly, that she was motivated to stay married
or not. And you're free to impeach by the fact that she,
ultimately, did get divorced which shows that she--maybe
it wasn't that, you know, steadfast in that belief--after all
and she filed for twice, so how steadfast could she be,
really--but, thirdly, the question of whether or not she had
an affair, to me, does not directly contradict or not.
Perhaps she may have filed--a decision for divorce, maybe
she wanted to have an affair, maybe she was having an
affair the entire time. That doesn't change the fact of
whether or not her motivation for--the fact that she has
filed for divorce is potential bias. The divorce equals
bias, the affair that may or may not be connecting by that
is outweighed. That's my decision on [Mil R. Evid.] 403.

Undeterred, defense counsel continued to press the purported affair as
impeachment by contradiction on another matter related to a charge that appellant
violated a military protective order by entering WS's residence and damaging her
car.[11] The military judge, standing by his previous ruling, stated, "I see that as
impeachment of collateral facts. In specific, [Mil. R. Evid.] 608 does not allow for
that. 608(c) is your biggest doorway to walk through, Counsel, with regards to bias.
. . ." In the end, the military judge precluded defense counsel from asking WS about
an affair or even the possible existence of a relationship with TL.

We review a military judge's decision to admit or exclude evidence for an
abuse of discretion. *United States v. Erickson*, 76 M.J. 231, 234 (C.A.A.F. 2017)
(citing *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)). An abuse of

---

[11] This allegation was charged as a violation of Article 90, UCMJ. The panel found
appellant not guilty of this offense.

discretion occurs if the military judge's findings of fact are clearly erroneous or his conclusions of law are incorrect. *Id.* "The abuse of discretion standard calls for more than a difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011) (citations and internal quotation marks omitted).

The military judge was correct that the possible affair was at best marginally relevant under Mil. R. Evid. 608(c) to show an overall motive by WS to fabricate the December 2014 assault or to show her overall bias. The military judge did not abuse his discretion in applying Mil. R. Evid. 403 and concluding any relevance for *that* purpose was outweighed by the risk of misleading the members. WS's act of filing for a divorce created a highly probative motive to fabricate or bias against appellant, but the defense could not establish that WS's reason for filing for the divorce sufficiently enhanced the probative value of her overall motive or bias against appellant beyond the filing itself.

The military judge, however, did not clearly explain his rationale for precluding the use of WS's possible affair as a matter of impeachment by contradiction. The existence of an affair directly contradicted WS's testimony on direct examination as to her reasons for seeking a divorce. WS made it clear on direct examination that the December 2014 assault was the catalyst for ending her marriage to appellant. The military judge evaluated this line of impeachment as if it was just another approach by defense to attack WS under Mil. R. Evid. 608(c). It was not.

Otherwise stated, WS's testimony created the distinct impression that it was more likely that the December 2014 assault occurred because she immediately filed for divorce after the incident. This government-created impression opened the door to, and enhanced the probative value of, any alternate theories regarding WS's reason for filing for the divorce. After her direct testimony, any alternate good faith basis proffered by defense for WS filing for divorce became highly probative to negate the government-created inference that WS immediately filed for a divorce and, ergo, she must have been assaulted by appellant in December 2014.

"Any party . . . may attack [a] witness's credibility." Mil. R. Evid. 607. A witness may be impeached in several ways. One method is by "specific contradiction." *United States v. Sojfer*, 47 M.J. 425, 427 (C.A.A.F. 1998). "Impeachment by contradiction is a common law theory recognized by our superior court and other federal courts." *United States v. Montgomery*, 56 M.J. 660, 668 (Army Ct. Crim. App. 2001) (citations omitted). This type of impeachment "involves showing the tribunal the contrary of a witnesses' asserted fact, so as to raise an inference of a general defective trustworthiness." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983) (citing 3A *Wigmore, Evidence* § 1000 (Chadbourne

rev. 1970); *McCormick's Handbook of the Law of Evidence* § 47 (E. Cleary 2d ed. 1972)).

The military judge also viewed the affair as not a proper basis for impeachment as it related to a collateral matter. This too was incorrect.

The Military Rules of Evidence specifically address impeachment by contradiction only of an accused, through the use of a suppressed statement or evidence. *See* Mil. R. Evid. 304(e)(1), 311(c)(1); *United States v. Langhorne*, 77 M.J. 547, 556 (A.F. Ct. Crim. App. 2017). However, impeachment by contradiction of a witness, though not codified, is permissible at a court-martial. *See Manual for Courts-Martial, United States,* (2016 ed.) [*MCM*], app. 22, Mil. R. Evid. 608 analysis at A22-55.

Normally, extrinsic evidence may not be used to impeach a witness on a collateral matter. *Langhorne*, 77 M.J. at 556 (citing *Banker*, 15 M.J. at 211). "A matter is collateral if the fact could not be shown in evidence for any purpose independent of the contradiction." *Id.* (quoting *United States v. Harris*, 542 F. 2d 1283, 1306-07 (7th Cir. 1976)). "However, an exception to that rule allows for the introduction of extrinsic evidence to impeach by contradiction a collateral matter raised on *direct* examination." *Id.* (citing *United States v. Fleming*, 19 F. 3d 1325, 1331 (10th Cir. 1994)), *cert. denied*, 513 U.S. 826 (1994)) (emphasis in original); *see United States v. Trimper*, 28 M.J. 460, 467 (C.M.A. 1983) ("If a witness makes a broad collateral assertion on direct examination that he has never engaged in a certain type of misconduct . . . he may be impeached by extrinsic evidence of the misconduct.") (citations omitted).

We also find the military judge, having misconstrued the proper use of impeachment by contradiction, did not properly weigh the admissibility of the possible affair under Mil. R. Evid. 403. "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the evidentiary ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Hursey*, 55 M.J. 34, 36 (C.A.A.F. 2001) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)). We afford a military judge's ruling in applying Mil. R. Evid. 403 less deference if the military judge fails to articulate his balancing analysis on the record. *Id.* (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

As WS was the victim of appellant's assaultive behavior, as well as a witness for the assault allegations involving CS and TS, her credibility played a central role at trial. As such, the probative value of impeaching WS on her overall credibility by means of contradiction, or "creating an inference of a general defective trustworthiness," had much greater weight than an attempt to impeach WS based upon a motive to fabricate the last assault. As the military judge did not articulate his analysis in weighing impeachment by contradiction using the alleged affair under Mil. R. Evid. 403, we afford the military judge's ruling less deference. We find the

probative value of this line of impeachment by contradiction outweighed the other considerations under Mil. R. Evid. 403. Accordingly, we also find the military judge abused his discretion in precluding defense counsel from questioning WS about the affair as a means of impeachment by contradiction.

This does not, however, end our inquiry. Even assuming the military judge erred, any error was harmless. Where the Sixth Amendment right to confrontation is violated and "an abuse of discretion is found, the case will be reversed unless the error is harmless beyond a reasonable doubt." *United States v. Moss*, 63 M.J. 233, 236 (C.A.A.F. 2006) (citing *United States v. Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005)). "We evaluate prejudice from an erroneous evidentiary ruling by weighing: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999) (citing *United States v. Weeks*, 20 M.J. 22, 25 (C.A.A.F. 1985)). Applying these factors, we find the military judge's error in prohibiting the defense from impeaching WS by contradiction with evidence of a potential affair harmless beyond a reasonable doubt.

First, the government case concerning the assault of CS and the December 2014 assault of WS was strong.[12] As for CS, the government did not rely solely upon her testimony about the sternum rub and subsequent bruising. CS's testimony was corroborated by WS, who also witnessed the bruising on CS's chest.

The December 2014 assault on WS was likewise corroborated by other evidence. CS heard the altercation and, when she went to the kitchen, witnessed WS face down on the floor. CS saw appellant, who was visibly mad, standing over WS with clenched fists. As further corroboration, the government called Special Agent ND from the Army Criminal Investigation Command, who interviewed appellant in March 2015. During the interview, appellant admitted to a December 2014 altercation with WS that escalated when WS threw a piece of toast at appellant. Appellant admitted he held WS's arms and held her down.

Second, the defense case as to the assaults of WS and CS was not strong, consisting mainly of cross-examination of the government's witnesses.

---

[12] We limit this analysis to the assault of CS and the December 2014 assaults of WS. As will be seen, we set aside Specification 2 of Charge III, involving a May 2013 assault of WS. The convening authority dismissed appellant's conviction of Specification 3 of Charge III, the assault of TS.

Third, the materiality of the evidence of the affair was minimized greatly by the other evidence corroborating WS's version of events as to herself and CS.

Fourth, any quality of the impeachment evidence was greatly outweighed by the totality of the evidence in the record.

On the basis of the entire record, we are convinced the military judge's ruling preventing defense counsel from impeaching WS by contradiction was harmless beyond a reasonable doubt.

### B. Lack of instructions as to defenses

Prior to closing arguments, the military judge provided his proposed findings instructions to defense and trial counsel for comment. The instructions did not include any provisions for defenses to the charges offenses.[13] Defense counsel did not object and, ultimately, did not ask for any additional instructions.[14] Both trial counsel and defense counsel stated that they had no objections to the military judge's instructions.

Appellant now asserts the military judge erred in failing to instruct the members on the defenses of accident, automatism, and parental discipline as they variously applied to the charged assaults. We agree, in part.

We review a military judge's instructions de novo. *United States v. Torres*, 74 M.J. 154, 157 (C.A.A.F. 2015) (citing *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002)). Rule for Courts-Martial 920(e)(3) provides that a military judge's instructions shall include "[a] description of any defense under R.C.M. 916 in issue." That is, a military judge must provide instructions as to any defense reasonably raised by the evidence. *United States v. Davis*, 76 M.J. 224, 228 (C.A.A.F. 2017) (citing *United States v. Taylor*, 26 M.J. 127, 128-29 (C.M.A. 1988)); *United States v. Ginn*, 4 C.M.R. 45, 48-49 (C.M.A. 1952). Whether an affirmative defense is "reasonably raised by the evidence is a question of law we review de novo." *Davis*, 76 M.J. at 228. A military judge must instruct the

---

[13] Based upon numerous comments by trial counsel and defense counsel during closing arguments, the military judge, sua sponte, provided an additional instruction as to self-defense for the final assault allegations involving WS.

[14] Defense counsel initially requested that the military judge instruct the members on appellant's good military character and character for peacefulness based on the testimony of defense witnesses at trial. After a preview of the government's rebuttal case, defense counsel withdrew these requests.

members concerning the availability and legal requirements of a defense "if the record contains some evidence to which the military jury may attach credit if it so desires." *United States v. Jenkins*, 59 M.J. 893, 897 (Army Ct. Crim. App. 2004) (quoting *United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2002)) (additional citation omitted).

Where, as here, defense counsel did not object to the military judge's instructions or request instructions as to affirmative defenses, we test for plain error. *Davis*, 76 M.J. at 229. "Under a plain error analysis, the accused has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *Id.* at 230 (citing *United States v. Payne*, 73 M.J. 19, 23 (C.A.A.F. 2014)). Where we find an error is plain and obvious, we then determine whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *McDonald*, 57 M.J. at 20 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

*1. Accident*

Appellant argues some evidence was presented at trial concerning the defense of accident as to the assault of CS and the December 2014 assaults of WS.[15] We disagree.

An accident defense is a complete defense that excuses an accused from all criminal liability. *Jenkins*, 59 M.J. at 898 (citing *United States v. Marbury*, 56 M.J. 12, 17 n.6 (C.A.A.F. 2001)). Rule for Court-Martial 916(f) provides for the affirmative defense of accident and reads "[a] death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable."

In order to establish the defense, an accused must first establish he engaged in an act not prohibited by law, regulation, or order. *Jenkins*, 59 M.J. at 899 (citation omitted). Second, an accused must show the act causing the injury was performed in a lawful manner with due care and without simple negligence. *Id.* "Simple negligence is the absence of due care for the safety of others that a reasonably prudent person would have exercised under the same or similar circumstances." *Id.* (quoting *United States v. Marbury*, 50 M.J. 526, 529-30 (Army Ct. Crim. App. 1999)). Finally, "there must be some evidence in the record that the act was done without any unlawful intent." *Id.* (citing *United States v. Van Syoc*, 36 M.J. 461,

---

[15] As to the first assault of WS in May 2013, we need not address the defense of accident because we find error and grant relief on that specification because the military judge failed to instruct the members on the defense of automatism.

464 (C.M.A. 1993) (quoting *United States v. Ferguson*, 15 M.J. 12, 17 (C.M.A. 1983)).  That is, the resulting injury must have been unintended or unexpected.  The defense does not excuse injury "resulting from a deliberate act toward another if the natural and direct consequences of the act include injury."  *Id.*  The record must contain some evidence of each of these elements before a military judge is required to provide an accident instruction.  *Id.* at 898; *see generally* Dept. of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook [Benchbook], para. 5-4 n.2, 3 (10 Sept. 2014).

### a. CS, Specification 1 of Charge III

The evidence adduced at trial concerning CS did not raise the defense of accident.

CS was clear in her testimony of the details of appellant's assault.  Appellant got on top of her during their encounter.  This initially may have been a lawful act– horseplay–with his daughter.  However, as she testified, he took it too far when he began to give her a "Charlie Horse" or "sternum rub."  Appellant rubbed her sternum in a painful manner with his knuckle for five minutes.

If appellant had stopped when CS first raised her objection to appellant's actions, perhaps the defense of accident would have come into play.  However, appellant was a trained combat medic with two combat deployments.  As Staff Sergeant TW, a combat medic himself, testified at trial, a sternum rub is a procedure taught to and used by combat medics to check for a patient's alertness or to get a response from an unconscious patient.  The procedure is very painful and, if done with too much force, can cause bruising.  Appellant applied this procedure to his daughter and continued to do so for five minutes even after she protested and asked him to stop.  The "natural and direct consequence" of appellant's act was to cause injury to CS – that is pain and bruising.  The military judge's failure to instruct on accident was not error, much less plain error.

### b. WS, Specifications 4 and 5 of Charge III

We likewise find nothing in WS's testimony raised "some evidence" of the defense of accident as to the December 2014 kitchen assaults.

On direct examination, WS testified that as the argument with appellant escalated, she threw a piece of toast at appellant.  Then:

> Q.  And what did he do next?
>
> A.  He came at me, mad, with that glazed-over look. And so I pushed him away from me and he grabbed me and he

16

pulled me down and pushed me down and just--holding me and then hit me in my thigh.

Q. Okay. So, when you say---

A. Punched me.

Q. When you say he took you, where were his hands on your body when he grabbed you?

A. It happened really fast, but what I--you know, he was like, you know, "You don't fucking do this," you know, that kind of stuff. Just, you know--and grabbed me and pushed me down and then----

Q. Where did he grab you? On your arm, just----

A. On my arms and then, like, twisted my arms, got behind me, and then pushed me down on the ground. Like, if you could just grab someone and kind of twist them and get them down on the ground--I was in a ball and he was holding me down with his arm and, like--he had his--I believe it was his left hand and his whole body over me, holding me down, and then punched my thigh.

Even more clearly than with CS, appellant's actions were intentional and unjustified. The military judge did not err in failing to provide an accident instruction for the December 2014 assaults of WS.[16]

---

[16] We find the convening authority did not dismiss Specification 4 of Charge III in his action. *See supra* Background, Section A. However, even though trial defense counsel did not object to Specification 4 of Charge III as an unreasonable multiplication of charges with Specification 5 of Charge III, we nonetheless exercise our discretion under Article 66(c) to consider this issue. We find Specification 4 of Charge III represented an unreasonable multiplication of charges with Specification 5 of Charge III. *See United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001) (citations omitted). Accordingly, we conditionally dismiss Specification 4 of Charge III in our decretal paragraph.

*2. Automatism*

Appellant argues the military judge erred in failing to, sua sponte, provide an instruction concerning automatism as to the first charged assault of WS (Specification 2 of Charge III). We agree.

Although automatism is not listed as an affirmative defense under R.C.M. 916, the Court of Appeals for the Armed Forces (CAAF) recognized it as a required instruction when reasonably raised by the evidence. *Torres,* 74 M.J. at 157. The CAAF defined automatism as "'[a]ction or conduct occurring without will, purpose, or reasoned intention,' 'behavior carried out in a state of unconsciousness or mental dissociation without full awareness,' and '[t]he physical and mental state of a person who, though capable of action, is not conscious of his or her actions,'" and an "'unconsciousness defense.'" *Id.* at 156 n.3 (citations omitted) (alterations in original). The CAAF held "[i]n cases where the issue of automatism has been reasonably raised by the evidence, a military judge should instruct the panel that automatism may serve to negate the *actus reus* of a criminal offense." *Id.* at 158. Later, CAAF was more direct: "we now adopt the *actus reus* approach in automatism cases, and hold that in those cases where the evidence reasonably raises the issue of automatism, military judges must instruct panels accordingly." *Id.* While the CAAF did not suggest an instruction for automatism, at least one of our sister service courts has suggested it must encompass two points: "(1) 'automatism may serve to negate the *actus reus* of a criminal offense[,]' and (2) the government has the burden to disprove automatism and prove conscious, voluntary conduct beyond a reasonable doubt." *United States v. Clugson*, No. 201500326, 2017 CCA LEXIS 43, at *23 (N.M. Ct. Crim. App. 31 Jan. 2017) (quoting *Torres*, 74 M.J. at 158).

On direct examination, WS explained what happened during the assault on 6 May 2013:

> Q. Could you describe what happened?
>
> . . . .
>
> A. Okay. [Appellant] was teaching combatives classes and, that night, in his sleep--he had done it before when we lived in Annapolis--but he just got up in his sleep--I was sound asleep--he got up, grabbed my arms, and, like, started holding me down and wrestling me and pulled my hands up and then twisted both of my arms, but my right wrist popped really loud. His eyes--when he gets really, really angry, he kind of goes into a different mode. There's this--and his eyes were awake--he told me, later, he was sleeping, but his eyes were awake and he just has

this look and he just took my hand and flipped it over. And then he realized what he had done and said he woke up . . . .

Q. Let me stop you there. When you talk about him "in his sleep" and that kind of thing, is that something he told you afterwards--that he had done that in his sleep?

A. Yes.

Q. But, when you were experiencing it that night, was he asleep?

A. No.

Q. How could you tell he was not asleep when he was doing that?

A. His eyes were wide open. I mean, he was full-on, like, aggressive. I mean, he had done it before in Annapolis. He picked me up and threw me across the bed. Just in dead sleep, just picked me up throw [sic] me. And he always says he doesn't remember, but he knows he does-- because--he's awake because he apologizes later and he tells me he's sorry and he remembers what he did, so I don't understand if you're asleep how you remember what you did.

. . . .

Q. When--after he had twisted your wrists, how did it stop that night?

A. I screamed. I was, "You're hurting me, you're hurting me, stop," you know, and just--he--that's when he was like, "Oh, I'm"--you know, and he's feeling bad and he rolled over and he was sorry and then ----

. . . .

Q. So, you said you were screaming and then he said something to you. What did he say? You said he apologized?

A. Yes.

Q. In the moment?

A. Yes.

On cross-examination, WS acknowledged appellant had been diagnosed with post-traumatic stress disorder (PTSD) and Traumatic Brain Injury (TBI) and suffered "night terrors." She further testified:

Q. And so, that night, when this happened, he grabbed you, you woke up, and you said his eyes looked really strange?

A. Yes, sir.

Q. They were wild-looking, weren't they?

A. Yes, sir.

. . . .

Q. And that's why I'm asking you. So, he was wild-eyed, he was holding you, he wasn't speaking, was he? At that time, he wasn't saying anything, was he?

A. No.

Q. And then I think you said you screamed? Because it was hurting?

A. Yes.

Q. And when you did that, then, he reacted and actually said something and he said, "Oh, I apologize"? Or he said something along----

A. Once he calmed down, yeah.

Q. Okay. And he immediately stopped squeezing?

A. Yes, sir.

Q. And he told you, then, that he had just had one of these, what you know be [sic], Night Terrors? That's what he told you?

A. Yes, sir.

Q. And that would be consistent with things that had happened before with him?

A. Very much so, sir.

We find the military judge erred in failing to provide the members an automatism instruction and such error was plain and obvious. WS's testimony on both direct and cross examination raised some evidence that appellant was asleep when he grabbed WS's wrists. WS acknowledged that his actions that night were also consistent with previous episodes of night terrors. Whether appellant's apology was sincere and his claim that he was asleep was genuine were matters for the members to consider. That, however, does not change the fact that WS's testimony presented some evidence of automatism, or an "unconsciousness defense."

Having found error, we must determine whether the error "materially prejudiced Appellant's substantial rights." *See United States v. Tovarchavez*, ARMY 20150250, 2018 CCA LEXIS 371, at *15 (Army Ct. Crim. App. 19 Jul. 2018). We find that it did. During closing argument, defense counsel argued:

> Specification 2 of Charge II [sic] is the 6 May assault charged on [WS] where they said he twisted her wrist. Now, it could very well be true that, a night in May, April, June, anytime you want to pick, that [appellant] could have been in this trance, he could have had a night terror, he could have grabbed his wife. Again, we know this happens. I'm not saying that she's lying about him grabbing her. He's probably done that many times; probably. But, every time he was in this trance, and every time--it was, basically, like being asleep. And, on this occasion, she told you, "Yeah, he grabbed me," and, if you believe her at all, she said, "and he was wild-eyed." Remember I asked her--I said, "You're saying he was wild-eyed?" "Yes, he was wild-eyed." And he didn't-- very important--he didn't say anything to her. He wasn't saying, "I'm going to get you," he said nothing to her. Why? He was in this trance. This was another night terror that he was acting out aggressively. He was

21

being combative.  He didn't say anything because he was in a trance; he was asleep.  And the second she started screaming, what happened?  He woke up. And he immediately said, "I'm sorry."

Essentially, defense counsel proffered a defense to the 6 May 2013 assault without asking for an instruction that would have told the members such a defense was viable.  That is, the members were not given the option of considering the possibility that appellant's conduct was legally excusable.  We set aside the finding of guilty as to Specification 2 of Charge III.

### 3. Parental Discipline

Even though we conclude the convening authority dismissed Specification 3 of Charge III involving TS, we nonetheless will address appellant's claim that the military judge committed plain error in failing to, sua sponte, provide an instruction to the members concerning the defense of parental discipline.

"A parent may punish a child for wrongdoing and not be guilty of a battery if the punishment is inflicted for the purpose of safeguarding or promoting the child's welfare, and if the punishment thus inflicted is not excessive in view of all the circumstances . . . ."  *United States v. Scofield*, 33 M.J. 857, 860 (A.C.M.R. 1991) (citation omitted).  However, the defense applies only when the force used is for the purpose of discipline and is reasonable.  *United States v. Arab*, 55 M.J. 508, 517 (Army Ct. Crim. App. 2001) (citing *United States v. Robertson*, 36 M.J. 190, 192 (C.M.A. 1992)).  The Benchbook Instruction provides:

> A parent does not ordinarily commit a criminal offense by inflicting corporal punishment upon a child subject to (his) (her) parental authority because such parental authority includes the right to discipline a child.  The corporal punishment must be for the purpose of safeguarding or promoting the welfare of the child, including the prevention or punishment of the child's misconduct, and the force used may not be unreasonable or excessive.

Benchbook, para. 5-16.

As an initial matter, we note that the staff judge advocate, in her Second Addendum to the SJAR–prepared after receiving appellant's post-trial matters–recommended that the convening authority dismiss this specification because the military judge failed to instruct on the defense of parental discipline.  We think that

was good advice.  We find the military judge erred in failing to provide this instruction and such error was plain and obvious.

The military judge's failure to provide the members with a parental discipline instruction was plain error.  In our view, the defense of parental discipline was clearly raised by the evidence.  TS ignored his father when told to go outside for a bike ride with his sisters.  Instead, TS locked himself inside the room.  Even CS, on cross-examination, admitted TS should not have acted in the manner in which he did.  After appellant struck the door, TS finally went on the bike ride per his father's instructions.  Appellant's actions may, as appellant characterizes them, have been "unconventional parenting."  Whether appellant's act of striking the door was reasonable–and the government's evidence was sufficient to overcome the defense of parental discipline–should have been a matter for the members to decide.

We do not find this error was harmless.  Again, although defense counsel did not request a parental defense instruction, he raised this defense in closing argument in asking, "Really?  Dads can no longer discipline their children?"  We cannot say beyond a reasonable doubt that the members, properly instructed on the parameters of parental discipline, would have still found appellant guilty of an assault by offer.

**CONCLUSION**

The findings of guilty as to Specifications 2 and 3 of Charge III[17] are SET ASIDE.  Specification 3 of Charge III is DISMISSED.  Specification 4 of Charge III[18] is conditionally SET ASIDE and conditionally DISMISSED.  *See United States v. Britton*, 47 M.J. 195, 203 (C.A.A.F. 1997) (Effron J. concurring); *United States v. Hines*, 75 M.J. 734, 738 n.4 (Army. Ct. Crim. App. 2016); *United States v. Woods*, 21 M.J. 856, 876 (A.C.M.R. 1986).  Our dismissal of Specification 4 of Charge III is conditioned on Specification 5 of Charge III surviving the "final judgment" as to the legality of the proceedings.  *See* Article 71(c)(1), UCMJ (defining final judgment as to the legality of the proceedings).

---

[17] These are reflected as Specifications 2 and 5 of Charge V on the referred charge sheet and DD Form 2701-1, and as Specifications 2 and 3 of Charge V on the promulgating order.

[18] This is reflected as Specification 7 of Charge V on the referred charge sheet and DD Form 2701-1, and as Specification 5 of Charge V on the promulgating order.

We AFFIRM the findings of guilty as to: Specifications 2 and 3 of Charge I (violations of Article 90, UCMJ),[19] Specifications 1 and 2 of Charge II (violations of Article 91, UCMJ)[20]; and Specifications 1 and 5 of Charge III (violations of Article 128, UCMJ).[21, 22]

The sentence is SET ASIDE. The same or a different convening authority may: 1) order a rehearing on Specification 2 of Charge III and the sentence; or 2) dismiss Specification 2 of Charge III and reassess the sentence, affirming no more than a bad-conduct discharge, confinement for twenty-four months, forfeiture of all pay and allowances, and reduction to the grade of E-1.[23] As to any sentence to confinement, appellant will be credited with the 243 days of pretrial confinement credit originally granted at trial and with an additional 86 days of confinement credit for the government's noncompliance with R.C.M. 305.

Senior Judge BURTON concurs.

---

[19] These are also reflected as Specifications 2 and 3 of Charge I on the referred charge sheet, DD Form 2701-1, and the promulgating order.

[20] These are also reflected as Specifications 1 and 2 of Charge II on the referred charge sheet, DD Form 2701-1, and the promulgating order.

[21] That is, we affirm the findings of guilty for the assault of CS between on or about 25 October 2010 and on or about 31 May 2012, and the assault by striking WS's thigh between on or about 1 December 2014 and on or about 31 December 2014, as reflected on the referred charge sheet and DD Form 2701-1 as Specifications 1 and 8 of Charge V, and as Specifications 1 and 6 of Charge V on the promulgating order.

[22] This opinion also serves to correct the convening authority's action to reflect the charges as they were presented to the members by showing the convening authority: disapproved and dismissed Specification 3 of *Charge III* (the assault of TS); disapproved and dismissed Specification 2 of *Charge IV* (a violation of Article 134); and approved the remaining findings of guilty.

[23] In reassessing the sentence, we are satisfied that the sentence adjudged on the offenses we affirm would have been at least a bad-conduct discharge, confinement for twenty-four months, forfeiture of all pay and allowances, and reduction to the grade of E-1. *See United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986); *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). This reassessment, being both appropriate and purging the record as it stands of error, does not otherwise limit the sentence that may be adjudged at a rehearing. *See* UCMJ, art. 63.

Judge HAGLER, concurring in part and dissenting in part:

While I concur with much of my colleagues' opinion—to include their finding on which specification the convening authority dismissed in his action—I respectfully disagree with other portions of their opinion, as discussed below.

First, I concur with the majority that the military judge did not abuse his discretion in denying defense counsel's efforts to use evidence of WS's relationship with another man to show her motive to fabricate under Mil. R. Evid. 608(c). The military judge found the existence of divorce proceedings between appellant and WS to be probative of a motive to fabricate. He also found WS's purportedly inconsistent testimony on the *timing* of the divorce to be probative of her credibility. The military judge properly allowed testimony on both of these issues. The military judge found, and I agree, that the underlying cause or causes of WS's divorce from appellant were of little probative value, as they were "two stages" removed from the allegations of abuse. At the same time, he found evidence of one such cause (i.e., WS's alleged extra-marital affair) to be highly prejudicial. I believe the military judge struck a proper balance under Mil. R. Evid. 403, given the low probative value of the witness's affair, its remoteness from the facts at issue, and the highly prejudicial nature of the evidence.

That said, I would find the military judge's decision was also correct on the related issue of impeachment by contradiction. Not only was WS's alleged affair far removed from any fact at issue, the evidence proffered by appellant did not directly contradict WS's testimony. On direct, WS testified she had previously tried to save the marriage, but she "was done" after appellant assaulted her in December 2014. The majority seems to equate this statement to a claim that the December 2014 assault was the immediate cause of WS's divorce. Thus, in the majority's view, evidence of WS's subsequent affair would tend to show her "I was done" testimony was false—that her affair was the actual cause of the divorce, not the assault.

I believe this reading overstates the significance of WS's statement, "I was done." In the context of her full testimony, I view this statement as an acknowledgement that—after a history of domestic abuse and failed attempts to save her marriage—the December 2014 assault was the "final straw" for her. Thus, it is difficult for me to see how appellant's proffered evidence contradicts WS's testimony. As noted above, the military judge properly allowed the defense to impeach WS on the *timing* of her divorce filing. But to my mind, evidence of the affair itself is minimally probative, if at all, of WS's credibility in testifying, "I was done," after the December 2014 assault. Again, the proffered evidence of an extramarital affair was highly prejudicial in that it tended strongly to paint WS as a bad person. The civilian defense counsel admitted as much at trial. The military judge applied Mil. R. Evid. 403 correctly and was well within his discretionary authority in excluding this evidence.

Second, while I concur with the majority's finding that the convening authority's action dismissed Specification 3 of Charge III (alleging an offer-type assault of TS), I disagree with their application of the parental discipline defense to this specification. I would find the defense was not reasonably raised by the evidence and further, the military judge's failure to instruct on the defense was harmless. The evidence showed that appellant, after drinking, reacted violently when his six-year-old son, who suffered from Asperger's Syndrome, told him "no," ran to his bedroom, and locked the door. Appellant shouted, "Don't fucking tell me no," "Fucking open the door," and "I'm going to spank your ass," before breaking open the door and "wailing on" his son.[24] All the while, the child screamed repeatedly, "I'm sorry, I'm sorry, I'm sorry."

To me, the evidence fatally undercuts two elements of the defense. Appellant had no proper disciplinary purpose in breaking open a door to get to his child, who was plainly terrorized by his father's violent outburst. Appellant's injury to his hand—which was serious enough to warrant a trip to the hospital—further portrays that he was motived by rage, not by a legitimate purpose. Likewise, the force appellant used was excessive, particularly given the young boy's developmental disorder and the purported excuse for the father's actions.

Yet the majority finds a rational panel could have reasonably found appellant's actions to be a proper exercise of parental discipline. I disagree. The defense allows parents to exercise their authority and responsibility to raise their children, but within reason. Perhaps I place too much faith in our court-martial panel members, but I believe no rational group of Soldiers could have relied on the evidence in this case to conclude appellant's actions were a proper exercise of parental authority. Thus, even if erroneous, I would find the lack of a sua sponte instruction was harmless.

Third, on the issue of automatism, I would find the evidence did not reasonably raise that appellant was asleep or unconscious at the time he grabbed his wife's wrists. WS testified on direct, cross, and re-direct, that appellant was "awake" and "not asleep," and she offered her observations why this was so. At the same time, she did testify that appellant *claimed* he was asleep, as he had done on previous occasions. But WS then said she did not believe him and provided reasons why: his eyes were wide open, he was very aggressive, and he later remembered what he did and apologized to her, as he had done in the past. In sum, the only evidence that possibly raised automatism was a few, isolated statements by WS,

---

[24] Although appellant was not charged with battery of his son, I find this circumstance was relevant to whether appellant had a proper purpose in breaking open the locked door, which was the basis for the charged, offer-type assault.

although her testimony, taken as a whole, unequivocally negated the potential defense.

Certainly, had the military judge instructed on automatism (and similarly, the parental discipline defense), the issue would be moot on appeal. Thus, it is still a wise course of action for military judges to instruct on potential defenses, in an abundance of caution, rather than making a close call on whether they are reasonably raised. Little harm can result from instructing a panel on a defense that might easily be disproved beyond a reasonable doubt. But here we are reviewing for plain error, not for the wisest course of action. I would find the defense was not reasonably raised, so there was no error, much less a plain and obvious one.

Finally, I disagree with the majority's award of 86 days of administrative credit for the government's noncompliance with R.C.M. 305(i). Although I also accept the government's concession of noncompliance, the majority's remedy reflects an oversimplification of this court's precedent and is therefore disproportionate to any harm suffered by the appellant.

At trial, the military judge found that the magistrate who conducted the seven-day review approved appellant's continued pretrial confinement and notified the parties of his decision by email within the required period. However, the military judge found the magistrate failed to document his findings and conclusions in a memorandum, as required by R.C.M. 305(i)(2)(D).[25]

The majority apparently relies on a footnote in *United States v. DeLoatch*, 25 M.J. 718 (A.C.M.R. 1987), for the needlessly broad proposition that R.C.M. 305(k) requires day-for-day credit for *any* noncompliance with R.C.M 305(i).[26] In *DeLoatch*, the magistrate's review was completed on the ninth day of pretrial confinement, not within the seven-day period. As a remedy, this court awarded Private DeLoatch two days of credit for the time he spent in pretrial confinement

---

[25] R.C.M. 305(k) reads, "The remedy for noncompliance with subsections (f), (h), (i), or (j) of this rule shall be an administrative credit against the sentence adjudged for any confinement served as the result of such noncompliance. Such credit shall be computed at the rate of 1 day credit for each day of confinement served as a result of such noncompliance."

[26] "It could be argued that no portion of confinement is a *result* of failure to have a magistrate review those cases where the magistrate subsequently finds probably cause and approves continued confinement. That would be a niggling interpretation. The spirit, if not the letter of the rule, is to provide a remedy for those days *between the date when the review should have occurred and when it actually occurs*." *DeLoatch*, 25 M.J. at 719 n.3 (first emphasis in original; second emphasis added).

without the benefit of a magistrate's review. *Id.* at 719. In contrast, the review here was completed on time, but the magistrate did not document it in a timely manner, so unlike Private DeLoatch, appellant spent no time in confinement without the benefit of a magistrate's review. Thus, even under the "spirit" of the rule described in the *DeLoatch*, day-for-day credit is not required.

If day-for-day credit is not required, then what remedy is appropriate in this case? At trial, the military judge reviewed the propriety of appellant's pretrial confinement under R.C.M. 305(j) and ordered that it continue. It would be difficult, then, to conclude appellant suffered any harm due to the magistrate's failure to document his rationale in reaching the same conclusion. As there is no evidence of bad faith by the government, awarding 86 days for a simple administrative failure is an unjust windfall to an appellant who was convicted and sentenced for serious crimes and suffered no appreciable harm as a result of the failure.

I would affirm the findings and sentence in this case, as approved by the convening authority and clarified by the majority opinion. I therefore respectfully dissent.

FOR THE COURT:

JOSEPH P. TALBERT
Chief Deputy Clerk of Court